923 A.2d 971

**PULTE HOME CORPORATION**

v.

**PAREX, INC. et al.**

**No. 2122, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

May 24, 2007.

688

690

Brian A. Coleman (Michael J. McManus, Jeffrey J. Lopez, Drinker, Biddle & Reath, LLP, on the brief), Washington, DC, for appellant.

Robert L. Ferguson, Jr. (James E. Garland, Ferguson, Schetelich & Ballew, P.A., on the brief), Baltimore, for appellee.

Panel: DAVIS, SALMON, LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

DAVIS, J.

Pulte Home Corporation (Pulte), the plaintiff below and appellant/cross-appellee on appeal, is a Michigan corporation and a builder of luxury residential homes. Parex, Inc. (Parex), a defendant below and the appellee/cross-appellant in this Court, is incorporated in Georgia and was engaged in the business of manufacturing and selling a synthetic stucco product known as Barrier Exterior Insulation and Finish System, or Barrier EIFS,[1] for home exteriors.

The instant appeal arises from protracted and complex litigation in the Circuit Court for Montgomery County between Pulte, Parex, and several co-defendants/cross-plaintiffs who shall be discussed further herein. The litigation concerned extensive water damage to seventy-seven homes built in Montgomery County, Maryland and Fairfax County, Virginia between 1994 and 1998. Barrier EIFS had been applied to all of the homes.[2] From a judgment of the circuit court granting Pulte some, but not all, of the damages it sought, Pulte has filed this appeal. Parex has filed a cross-appeal.

---

1. The product is also known as Parex System 3. For the sake of consistency, we shall refer to it throughout this opinion as Barrier EIFS.

2. Initially, Pulte also sought to recover from Parex's codefendants for repairs Pulte made to thirty-three homes constructed with a Parex product known as Drainable EIFS. Unlike Barrier EIFS, it incorporates a system for expelling water that leaks behind the exterior surface of the product. Pulte alleged that the Drainable EIFS, through no fault of Parex, had been improperly installed. Pulte voluntarily dismissed with prejudice its claims as to four of the thirty three homes. It subsequently settled all of its claims with the co-defendants, thus removing the remaining Drainable EIFS claims from the case.

## FACTUAL AND PROCEDURAL BACKGROUND

As indicated *supra*, Barrier EIFS is a synthetic stucco material applied to the exteriors of residences and other buildings. Evidence presented at trial established that most residences, including the seventy-seven luxury homes at issue in this appeal, are built with wood studs which form the structure for attaching an exterior covering, such as plywood sheathing or gypsum board, and an interior finish, such as wallboard. The space between the exterior covering and interior finish is generally filled with insulation. A cladding, or additional covering, is attached or applied to the outside of the exterior covering.

There are two primary types of cladding systems. The first type, the cavity system, requires that brick or siding be attached to the exterior covering of the home. There is a cavity, or air space, behind the veneer of the brick or siding, and it is anticipated that some water will get into that cavity. The water will drop down and be forced out of the cladding system through a series of weeps and flashings before it can reach the exterior covering.

The second type of cladding system, used in the seventy-seven homes at issue in this case, is the barrier system. Products such as Barrier EIFS are applied to the outside of the exterior covering with the expectation that no water will ever get behind the cladding. A barrier cladding system requires the installation of a fiberglass mesh against the exterior covering, followed by the attachment of an insulation board. A cement-like mixture is then applied to the insulation board with a trowel. Finally, a fiberglass fabric is embedded into the cement-like mixture.

In order to ensure that water cannot seep behind the barrier cladding, leak-proof flashing, which will immediately repel water to the outside of the cladding system, must be used in places where the cladding adjoins other materials, such as window frames and cornices. Special tapes, caulks, sealants and insulations also must be used in such places to form a bond between the barrier product, the flashing and the

other building materials. If water does get behind the cladding system it can cause damage, beginning with the exterior covering and possibly extending to the interior finish.

Pulte alleged that water penetrated and was retained behind the Barrier EIFS cladding on the seventy-seven homes in Montgomery County and Fairfax County, causing rot and other water-related damages. Pulte further alleged that it "expended millions of dollars in repair and replacement costs on these homes, and expects to incur additional such damages in the future." That is, Pulte replaced the Barrier EIFS cladding on the seventy-seven homes with drainable EIFS cladding that was not manufactured by Parex.

A drainable EIFS is, in essence, a hybrid of a cavity system and a barrier system. It integrates a small space behind the outside veneer of the EIFS to allow water to drop down. The system also uses more protective material between the space and the exterior covering.

On June 14, 2001, Pulte, on its own behalf and as the assignee of the individual owners of the seventy-seven homes, filed the complaint in the Circuit Court for Montgomery County that initiated this action. The suit named as defendants: Parex; Barrier EIFS suppliers/distributors American EIFS Stone & Stucco, Inc. (American EIFS) and American Stucco & Stone, Inc. (American Stucco); Barrier EIFS applicators Coronado Corporation (Coronado) and CSS, LLC (CSS), with whom Pulte had contracted to install the Barrier EIFS; and Bernard A. Franks and his son, Benjamin B. Franks, the principals, owners and/or controlling parties of American EIFS, American Stucco, Coronado, and CSS. Pulte mistakenly titled the complaint "Amended Complaint," apparently because it had earlier filed an initial "Complaint" that was dismissed without prejudice for lack of prosecution.

Pulte subsequently filed a "Second Amended Complaint and Jury Demand." Upon Parex's motion to dismiss, the court dismissed with prejudice counts against Parex for breach of express warranties, unfair and deceptive trade practices under Maryland law, violation of the Virginia Consumer Protection

Act, common law indemnifications, contribution, and declaratory judgment. Pulte then filed its "Third Amended Complaint and Jury Demand," which we shall at times throughout this opinion refer to as simply "the complaint." It included the following counts:

COUNT ONE—Negligence on the parts of American EIFS, American Stucco, Coronado, CSS, Bernard Franks, and Benjamin Franks.

COUNT TWO—Breach of contract by Coronado, CSS, Bernard Franks, and Benjamin Franks.

COUNT THREE—Breach of express warranties by all defendants except Parex.

COUNT FOUR—Breach of implied warranty of merchantability and implied warranty of fitness for a particular purpose by all defendants.

COUNT SIX [3]—Negligence and/or strict liability on the part of Parex.

COUNT SEVEN—Negligence and/or strict liability by way of failure to warn on the parts of all defendants.

COUNT EIGHT—Actual fraud on the part of Parex.

COUNT NINE—Negligent misrepresentation on the parts of all defendants.

COUNT TEN—Constructive fraud on the parts of all defendants.

COUNT ELEVEN—Actual fraud on the parts of Coronado, CSS, Bernard Franks, and Benjamin Franks.

COUNT TWELVE—Negligent misrepresentation on the parts of Coronado, CSS, Bernard Franks, and Benjamin Franks.

COUNT THIRTEEN—Constructive Fraud on the parts of Coronado, CSS, Bernard Franks, and Benjamin Franks.

---

**3.** In its third amended complaint Pulte mistakenly numbers what should be Count 5 as Count 6, thereby misnumbering all of the following counts.

COUNT FOURTEEN—False advertising under Virginia law by Parex, American EIFS, American Stucco, Bernard Franks, and Benjamin Franks.

COUNT FIFTEEN—Contractual indemnification against Coronado, CSS, Bernard Franks, and Benjamin Franks.

COUNT SIXTEEN—Subrogation against all defendants.

American EIFS, American Stucco, Coronado, CSS, Bernard Franks, and Benjamin Franks filed cross-complaints against Parex,[4] and in some cases against each other. American EIFS made claims against Parex in its cross-complaint for indemnity or contribution based on theories of breach of contract, negligence, and breach of warranty. It also made claims for breach of contract, negligence, and breach of warranty. American Stucco made claims against Parex and CSS for indemnity and contribution based on strict liability, negligence, breach of express and/or implied warranties of fitness and merchantability, and equity.[5] CSS and Benjamin Franks alleged they were entitled to indemnity or contribution from Parex, American EIFS, and American Stucco based on theories of negligence and breach of express and/or implied warranties of fitness and merchantability. Coronado and Bernard Franks alleged that they were entitled to indemnity or contribution from Parex based on theories of negligence and breach of express and/or implied warranties of fitness and merchantability.

Various motions to dismiss and motions for summary judgment were then filed. The court entered summary judgment on all claims brought by Pulte against American Stucco on the ground that it "did not exist as a properly-formed entity until

---

4. CSS filed its cross-complaint against Parex and suppliers American EIFS and American Stucco. American Stucco named both Parex and CSS as cross-defendants in its cross-complaint.

5. In addition, Parex filed a third-party complaint against Builders FirstSource, the company that manufactured, assembled, and installed the windows in the seventy-seven homes. At the start of trial, the court resolved the third-party complaint by entering summary judgment in favor of Builders FirstSource and against Parex.

after the time that the subject Barrier EIFS homes were built." [6] A hearing was held on the remaining motions and the court issued an order which set forth, in pertinent part, the following:

UPON CONSIDERATION of the several motions of [the defendants and cross-defendants], and argument of counsel, it is, this 23rd day of August, 2004, by the Circuit Court for Montgomery County,

ORDERED as follows:

1. Parex's Motion for Summary Judgment as to the Third Amended Complaint be and hereby is GRANTED as to all Counts against Parex except Count XIV (False Advertising Under Virginia Law).

2. As to CSS's and Ben Franks' joinder in Parex's Motion for Summary Judgment, joinder is permitted, and the motion be and hereby is GRANTED as to Counts IV (Breach of Implied Warranties), Count VII (Negligence and/or Strict Liability), and Count XVI (Subrogation) against CSS and Ben Franks, and Count XIV (False Advertising Under Virginia Law).

3. As to American EIFS's Joinder in Parex's Motion for Summary Judgment, joinder is permitted, and the motion be and hereby is GRANTED as to Counts IV (Breach of Implied Warranties), Count VII (Negligence and/or Strict Liability) and Count XVI (Subrogation) against American EIFS, and Count XIV (False Advertising Under Virginia Law).

4. The Court applies the same rulings referenced in Paragraphs 2 and 3 above to defendants Coronado Corporation and Bernard Franks, such that Counts IV (Breach of Implied Warranties), Count VII (Negligence and/or Strict Liability) and Count XVI (Subrogation) are hereby DISMISSED as to those defendants.

---

**6.** American Stucco remained in the case, *albeit* briefly, as a cross-defendant in the cross-complaint brought by CSS.

At that point, the only count from Pulte's Third Amended Complaint that remained against Parex was Count Fourteen. Counts one, three, nine and ten, remained against American EIFS; Counts one, two, three, nine, ten, eleven, twelve, thirteen and fifteen remained against CSS, Coronado, Bernard Franks, and Benjamin Franks.

Trial on the remaining claims and on the cross-claims was scheduled to begin on April 25, 2005. That morning, however, Pulte and all of the defendants except Parex reached and signed a "Settlement and Release Agreement."[7] The agreement provided:

> WHEREAS, Pulte and Defendants and Defendants' Insurers, have reached an agreement to resolve Pulte's pending claims against Defendants ... whereby Defendants agree to the entry of a consent judgment against Coronado and CSS in the amount of $5,667,500.08 plus costs and reasonable attorneys' fees, and against American EIFS in the amount of $5,229,300.22 plus costs and reasonable attorneys' fees, and an assignment of all Defendants' claims, rights, and causes of action stemming from this Lawsuit to Pulte, and Pulte agrees not to execute on these consent judgments against Coronado, CSS, American EIFS or Defendants' Insurers, and Pulte agrees to Dismiss With Prejudice the Defendants Bernard Franks and Benjamin Franks from the Lawsuit, and to Dismiss With Prejudice Counts Eleven, Twelve, and Thirteen (alleging fraud, constructive fraud and negligent misrepresentation) against all Defendants named in those counts; and Defendants' Insurers agree to pay Pulte $725,000.00. . . .

---

7. Although the trial court had previously entered summary judgment in American Stucco's favor as to the claims brought by Pulte, American Stucco was a party to the settlement agreement and Benjamin Franks signed the agreement on its behalf. The agreement did not contemplate a consent judgment against American Stucco and in favor of Pulte. It did, however, contain a paragraph by which American Stucco admitted "liability to CSS on CSS's cross-claim against American Stucco." Pulte agreed "not to enter judgment against American Stucco as to its admission of liability to CSS". . . .

**704**

* * *

NOW, THEREFORE, in consideration of the Defendants Coronado, CSS, and American EIFS's agreement to enter the Consent Judgments with Pulte as herein after provided, the transfer to Pulte of Defendants' claims, rights and causes of actions related to the Lawsuit, assist[a]nce given to Pulte with respect to proceeding on the claims, rights, and causes of action of Defendants and any Claims they have or may have, the payment of Defendants' Insurers to Pulte, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

* * *

1.7. "CSS/Coronado Consent Judgment" means the agreement of Pulte, Coronado and CSS that Judgment be entered by the Court against Coronado and CSS on Pulte's Third Amended Complaint.... The parties ... agree for purposes of this CSS/Coronado Consent Judgment that Pulte's Barrier EIFS claims, including those claims sounding in contract, consist primarily of allegations or product defectiveness.

1.75. "American EIFS Consent Judgment" means the agreement of Pulte, CSS and American EIFS that Judgment be entered by the Court against American EIFS on Pulte's Third Amended Complaint and on CSS's Cross-claim [against American EIFS] ...

* * *

[3.](d) Pulte agrees not to execute on the CSS/Coronado Consent Judgment or the American EIFS Consent Judgment against Coronado, CSS, and American EIFS or the Defendants' Insurers....

(e) The Defendant's Insurers shall promptly pay Pulte $725,000.00 in exchange for the full and complete release set forth ... herein.

(f) Defendants do hereby transfer and assign to Pulte all claims, rights, and Causes of Action they may have against third-parties which arise from or are related to the facts set forth in the Lawsuit, including without limitation, all contractual, breach of warranty and other claims, rights and causes of action [they] may have against Parex, Inc. . . .

The settlement agreement and the contemplated dismissals were filed with the court that same day. The contemplated consent judgments were entered subsequently. The consent judgments were set forth in a single document and included (1) a judgment against CSS and Coronado and in favor of Pulte for $5,667,500.08 plus costs and reasonable attorneys' fees, (2) a judgment against American EIFS and in favor of Pulte for $5,229,300.22, and (3) a judgment in favor of CSS in its cross-claim against American EIFS for $5,229,300.22. Thus, when the trial began on April 25, 2005, the only count remaining from Pulte's Third Amended Complaint was Count fourteen, which set forth the claim against Parex for false advertising under Virginia Law. Pulte also pursued against Parex the claims for indemnity and/or contribution that were assigned to it by CSS, Coronado, American EIFS, and American Stucco pursuant to the settlement agreement.

Trial proceeded and, at the close of Pulte's case, Parex moved for judgment as to Pulte's direct claim against it for false advertising under Virginia law, and as to the assigned cross-claims. The court granted Parex's motion as to the false advertising count, holding that Pulte had failed to present sufficient evidence to support the allegation. It further granted Parex's motion as to all of the assigned cross-claims, with the exception of breach of implied warranty claims purportedly assigned by Coronado and CSS to Pulte.

Parex presented its defense, and the case went to the jury. In rendering its decision, the jury completed special interrogatories as follows:

1. Do you find by a preponderance of evidence that Pulte Home Corporation has proven that Parex, Inc.'s prod-

uct was unfit for the ordinary purposes for which such goods are used?

Yes ____ No *X*

2. Do you find by a preponderance of the evidence that Pulte Home Corporation has proven that the Parex product was unfit for the particular purpose for which it was intended?

Yes *X* No ____

3. Do you find by a preponderance of the evidence that Plaintiff, Pulte Home Corporation, has proven that the product of the Defendant, Parex, Inc., used in the Pulte home construction was defective?

Yes *X* No ____

4. Do you find by a preponderance of the evidence that Pulte Home Corporation has proven that it gave timely, reasonable notice of the breach of warranty of Parex, Inc's product?

Yes *X* No ____

5. Do you find by a preponderance of the evidence that Plaintiff, Pulte Home Corporation, has established that a sale of Parex's products existed between Parex and American EIFS Stone & Stucco Supply, Inc.?

Yes *X* No ____

6. Do you find by a preponderance of the evidence that Plaintiff, Pulte Home Corporation, has established that a sale of Parex's products existed between Parex and American Stucco & Stone, LLC?

Yes *X* No ____

7. In what amount do you find Pulte Homes Corporation has proven by a preponderance of the evidence as damages suffered by CSS, LLC, or Coronado because of breach of implied warranties by Parex?

$ *3.8 million*

8. Do you find by a preponderance of the evidence that Parex, Inc. has proven that a contract existed between

Parex and American EIFS Stone & Stucco Supply, Inc., as represented by Parex Exhibit # 41?

Yes *X* No ____

9. Do you find for any home in question that Parex, Inc. has proven by a preponderance of the evidence that its products were delivered to the purchaser prior to June 14, 1997? [8]

Yes *X* No ____

10. Identify separately each house incorporating Parex['s] product upon which there was delivery after June 14, 1997, and for which there was a breach of implied warranty. . . .

[23 houses identified]

11. For each house upon which there was delivery after June 14, 1997, in what amount do you find Pulte Home Corporation has proven by a preponderance of the evidence as damage suffered by CSS, LLC or Coronado because of a breach of implied warranties?

*$ 50,000 per house*

12. For each house upon which there was a delivery of goods after June 14, 1997, in what amount do you find that Pulte Home Corporation has proven by a preponderance of the evidence that Coronado paid for the product of Parex, Inc. delivered to it?

*$ 0*

13. For each house upon which there was delivery of goods after June 14, 1997, in what amount do you find that Pulte Home Corporation has proven by a preponderance of

---

8. The significance of the date June 14, 1997 is that it was exactly four years before the filing of the so-called "Amended Complaint" that initiated the proceedings in this case. As shall be explained in Part I of our Discussion as to Pulte's appeal, the trial court determined, over Pulte's objection, that the statute of limitations on the assigned claims pursued by Pulte, ran not from the date of the settlement payment by Coronado and CSS, but from the date of the delivery of the materials to the construction site.

the evidence that CSS, LLC paid for the product of Parex, Inc. delivered to it?

$ *0*

14. In the event you have found that any damages are due Pulte Home Corporation, do you find that Pulte Homes has proven by a preponderance of the evidence that it should be awarded further damages for pre-trial interest?

Yes *X* No _____

Ultimately, the court entered judgment in favor of Pulte and against Parex for $1,429,380.16, representing $1,150,000.00 in damages for the 23 homes for which Barrier EIFS was delivered after June 14, 1997, and $279,380.16 in prejudgment interest.

## ISSUES

Pulte's primary contention on appeal, in essence, is:

I. The trial court erred by applying the Uniform Commercial Code (UCC) statute of limitations to the indemnity claims assigned to Pulte by Coronado and CSS as part of the settlement agreement.

Pulte presents additional arguments to be considered by this Court "in the event that judgment is not directed in [its] favor in the full amount." We re-phrase the additional arguments as follows:

II. The trial court erred by granting Parex's motion for judgment as to the indemnity claims assigned to Pulte by American EIFS and American Stucco,

III. The trial court erred by granting Parex's motion to dismiss Pulte's breach of express warranties claim,

IV. The trial court erred by granting summary judgment in Parex's favor on the breach of implied warranty claims brought by Pulte in its own capacity,

V. The trial court erred by granting summary judgment in Parex's favor on the tort claims brought by Pulte in its own capacity and as assignee of the homeowners, and

VI. The trial court erred by granting summary judgment in Parex's favor on Pulte's legal subrogation claim.

In its cross-appeal, Parex disputes Pulte's contentions and argues, in essence, as follows:

I. The trial court erred by permitting the breach of implied warranty claims assigned by Coronado and CSS to go to the jury, in that Pulte failed to prove: that either Coronado or CSS suffered any damages; the specific amount of damages suffered by Coronado as opposed to CSS; or whether the Barrier EIFS was sold by American EIFS or American Stucco, and whether it was sold to Coronado or CSS,

II. The trial court erred by failing to rule as a matter of law that Pulte could not recover on the implied warranty of fitness claim assigned to it by Coronado and CSS because there was no privity of contract, or equivalent relationship, between Coronado and CSS, on the one hand, and Parex on the other,

III. Assuming *arguendo* that the UCC statute of limitations was applicable, the jury erred in determining that Pulte was entitled to recover as to four of the homes, where the evidence showed that delivery of the Parex product for those homes necessarily occurred more than four years before Pulte filed the suit that initiated this case,

IV. The trial court erred by permitting Pulte to recover anything from Parex on the assigned cross-claims because Coronado and CSS admitted fault, or, in the alternative, by permitting Pulte to recover more than the amount Coronado and CSS paid Pulte to settle Pulte's claims against them,

V. The trial court erred by failing to rule as a matter of law that Parex excluded any implied warranties of merchantability or fitness,

VI. The trial court abused its discretion by failing to grant a mistrial when counsel for Pulte repeatedly referred to subsequent remedial measures and subsequent building code changes, and

VII. The trial court erred by accepting the jury's determination that pre-judgment interest was warranted, and in calculating the amount of that interest.

We find merit in Pulte's second argument, as well as the fourth and seventh arguments raised in Parex's cross-appeal. We shall therefore vacate the judgment entered by the trial court in favor of Parex on the implied indemnity claims brought by Pulte as assignee of American EIFS. We shall also vacate the award of damages to Pulte and remand the case to the trial court with instructions.

## STANDARDS OF REVIEW

We are called upon to review a plethora of legal rulings by the trial court. In the third issue it raises in its cross-appeal, Parex asks us to review one factual determination made by the jury.

■ "We review *de novo* a trial judge's decision involving a purely legal question." *Ehrlich v. Perez,* 394 Md. 691, 708, 908 A.2d 1220 (2006). Specifically, as to motions to dismiss, we recently summarized the standard of review as follows:

"The proper standard for reviewing the grant of a motion to dismiss is whether the trial court was legally correct. In reviewing the grant of a motion to dismiss, we must determine whether the complaint, on its face, discloses a legally sufficient cause of action." In reviewing the complaint, we must "presume the truth of all well-pleaded facts in the complaint, along with any reasonable inferences derived therefrom." "Dismissal is proper only if the facts and allegations, so viewed, would nevertheless fail to afford plaintiff relief if proven."

*Higginbotham v. Pub. Serv. Comm'n,* 171 Md.App. 254, 264, 909 A.2d 1087 (2006) (citations omitted).

■ Similarly, "[t]he standard of review for a grant of summary judgment is whether the trial court was legally correct." *Goodwich v. Sinai Hosp. of Balt., Inc.,* 343 Md. 185, 204, 680 A.2d 1067 (1996). "When reviewing a grant of summary judgment, we first determine whether a genuine dispute

of material fact exists 'and only where such dispute is absent will we proceed to review determinations of law.' " *Law Offices of Taiwo Agbaje v. JLH Props., II, LLC.*, 169 Md.App. 355, 367, 901 A.2d 249 (2006) (citation omitted). "In doing so, we construe the facts properly before the court, and any reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party." *Remsburg v. Montgomery*, 376 Md. 568, 579–80, 831 A.2d 18 (2003). "[W]e evaluate 'the same material from the record and decide [ ] the same legal issues as the circuit court.' " *Campbell v. Lake Hallowell Homeowners Ass'n*, 157 Md.App. 504, 518–19, 852 A.2d 1029 (2004) (citation and quotations omitted). "We 'uphold the grant of a summary judgment only on the grounds relied on by the trial court.' " *Law Offices of Taiwo Agbaje*, 169 Md.App. at 368, 901 A.2d 249 (citation omitted).

▆▆▆ As to the single challenge to a factual finding by the jury, we observe that "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions. . . ." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 272, 841 A.2d 828 (2004). "Our first order of business is to reiterate longstanding Maryland law that it is not the province of an appellate court to express an opinion regarding the weight of the evidence when reviewing a judgment on a jury verdict." *Owens–Corning Fiberglas Corp. v. Garrett*, 343 Md. 500, 521, 682 A.2d 1143 (1996). " 'When properly reserved, we pass upon the sufficiency of evidence to take a case to the jury, but we do not review the weight of the evidence after it has been passed upon by a jury.' " *Id.* (citation omitted).

## DISCUSSION

### Pulte's Appeal

#### I.

#### Statute of Limitations on Assigned Claims of Coronado and CSS

Pulte's first issue reaches this Court in a curious posture. As we have indicated, the cross-claims of Coronado and CSS

against Parex sought indemnity and/or contribution. Each of their cross-complaints set forth the roles of the various parties in the construction of the homes in issue, then: reiterated that Pulte alleged that the Barrier EIFS was defective; asserted that Parex expressly and impliedly warranted that the product was free of defects; and asserted that, if Pulte was entitled to recover from the cross-plaintiffs because the product was defective or because Parex was negligent or breached an express or implied warranty, then the cross-plaintiffs were entitled to indemnity and/or contribution from Parex. Both Coronado and CSS "pray[ed] for judgment, by way of indemnity [and/or] contribution for a *pro rata* sum" in their favor against Parex.

At the close of Pulte's case, the trial court granted Parex's motion for judgment as to all of the assigned indemnity and contribution claims. Specifically, as to the assigned claims of Coronado and CSS, the court stated:

> There are two viable theories upon which Pulte, as . . . assignee of the homeowners and as a direct party itself through the ownership of the claims of Coronado [and] CSS . . . can assert liability against Parex. The first of these is an indemnification style of action. The second is through implied warranty.
>
> There is no ability for a jury to determine what an indemnification claim would be, and that distinction is heightened by two factors. The first of which is that Coronado and CSS, as applicators, were sued in their own right, upon which settlement was had, for negligence in the application of the product, and it thereby becomes incumbent upon Pulte to demonstrate in an indemnification action that the product defect was the cause of the loss and not the application. . . .

> \* \* \*

> The second theory by which Pulte Homes Builders can make claim against Parex is under an implied warranty. And [it] has been, I think, correctly stated, as a matter of

law, this does not require privity of contract. Privity of contract is no longer, well, a common law, and in non-UCC transactions is still a necessity, it is not under the circumstances of the facts of this case.

\* \* \*

A defense to the damages, which must be proven by a preponderance of the evidence under this theory, might well be that others caused the damages. In other words, the right to point to an empty chair, and assert that there's nothing wrong with the product, that Coronado or CSS are the wrongdoers, and, ... the amount that's claimed is wrong because the product's not defective, and because others were responsible....

So the Court believes that the only remaining claims[s] that exists [are] a claim[s] by Coronado or CSS for breach of implied warranty of fitness for purpose and use [and breach of implied warranty of merchantability], and the Court will allow the case to proceed forward on that basis....

Subsequently, after Parex presented its defense, Pulte requested that the court vacate its decision to enter judgment in Parex's favor on the indemnity claims. The court heard lengthy argument from counsel, then stated,

[I]t is my view that my original ruling on the dismissal of the indemnity claims was correct.

And as a result, the Court declines the motion to vacate and they will remain out of the case.

■ We have scoured the record and we find no pleading by which Coronado or CSS, or Pulte as assignee of Coronado or CSS, initiated a specific action against Parex for breach of the implied warranties of fitness or merchantability. The cross-complaints make clear that both Coronado and CSS filed cross-claims for indemnity or contribution *based, inter alia,* on breach of the implied warranties. It is beyond cavil that "[ a]n indemnity action is of a separate and distinct nature from the tort or contract action which underlies it." 42 C.J.S.

*Indemnity* § 3 at 75–76 (1991) (footnote omitted). Thus, it would appear that once the trial court granted judgment in Parex's favor as to the assigned indemnity claims of Coronado and CSS, no assigned claims remained for Pulte to pursue.

The trial court nevertheless expressly concluded that breach of implied warranty claims, purportedly assigned by Coronado and CSS, remained in the case. In reaching this conclusion, the court implicitly read the cross-complaints against Parex of both Coronado and CSS to include breach of implied warranty claims in addition to indemnity claims based on implied warranties. Parex never suggested to the court that the cross-complaints could not be read so broadly and, thus, tacitly conceded that it was on notice as to any breach of implied warranty claims by Coronado and CSS.

Under Md. Rule 2–303(a), "[e]ach cause of action [in a complaint] shall be set forth in a separately numbered count." As we have indicated, the cross-complaints of both Coronado and CSS clearly requested indemnity and/or contribution, identifying the implied warranties as one of three bases on which such indemnity and/or contribution could rest. Neither complaint set forth a separate, identifiable count for breach of the implied warranties. Nevertheless, "All pleadings shall be so construed as to do substantial justice." Md. Rule 2–303(e).

As the Court of Appeals has summarized:

Although Maryland abandoned the formalities of common law pleading long ago, it is still a fair comment to say that pleading plays four distinct roles in our system of jurisprudence. It (1) provides notice to the parties as to the nature of the claim or defense; (2) states the facts upon which the claim or defense allegedly exists; (3) defines the boundaries of litigation; and (4) provides for the speedy resolution of frivolous claims and defenses.... Of these four, notice is paramount.

*Scott v. Jenkins,* 345 Md. 21, 28, 690 A.2d 1000 (1997) (citations omitted). Here, the cross-complaints clearly apprized Parex of the breach of implied warranty claims, albeit in the

guise of requesting damages or contribution based on the alleged breaches.

It is well established, moreover, that a defendant may waive any objection to a defect in pleading by failing to object to it. *See Kirchner v. Allied Contractors, Inc.,* 213 Md. 31, 36, 131 A.2d 251 (1957)(defendant's responses to both contract and tort claims in plaintiff's complaint, despite plaintiff's failure to delineate separate counts, amounted to waiver of objection to defect). Here, Parex did not object, on the ground that the cross-complaints did not set forth counts for breach of implied warranty, to the court's decision to allow the breach of implied warranty claims to proceed. Its extensive argument in the trial court, *and its extensive argument on appeal to this Court,* to the effect that the UCC statute of limitations rather than the statute of limitations for indemnity claims should apply suggests "acceptance" of the trial court's decision. *See id.*

It is thus of no consequence that the cross-complaints of Coronado and CSS did not include separate, specific counts for breach of the implied warranties. The cross-complaints sufficiently apprized Parex that it would be required to defend against breach of implied warranty claims, at least to the extent that they formed the basis of the indemnity claims by Coronado and CSS. Moreover, Parex's actions once the court ruled that the breach of implied warranty claims would go to the jury amounted to a waiver of any challenge to the claims based on the state of the cross-complaints.

Given the trial court's decision at the close of Pulte's case to grant judgment in favor of Parex on the assigned indemnity claims, but to allow assigned breach of implied warranty claims to proceed, it is readily apparent that Pulte's first argument on appeal, that the trial court erred by applying the UCC statute of limitations instead of the statute of limitations for indemnity, is without basis.

To reiterate, the trial court ruled that the applicable statute of limitations was the statute of limitations set forth by the UCC for the sale of goods. The court further ruled that

the event that triggered the running of the statute was the delivery of the Barrier EIFS product to the construction sites.[9] *See* Md.Code Ann., Com. Law Art. § 2–725(1) and (2);[10] Va.Code Ann. § 8.2–725(1) and (2) (2001 Repl. Vol. 2006 Supp.).[11] Thus, the court concluded that Pulte could not recover from Parex on any breach of implied warranty claim assigned to Pulte by Coronado or CSS if the Barrier EIFS for the houses to which the claims related was delivered prior to June 14, 1997, or more than four years before Pulte filed the complaint that initiated this case.

June 14, 1997 was exactly four years before the date that Pulte filed the complaint that initiated this case. Coronado and CSS did not file their cross-complaints for indemnification against Parex until July 11, 2002. Arguably, under a proper application of the relevant statute, Pulte should have been permitted to recover only on those assigned claims for homes for which deliveries of Barrier EIFS were made on or after July 11, 1998. The jury was not asked to specify which, if any, deliveries were made on or after that date, however. In any event, Parex has never argued that, even if the UCC statute of limitations was properly applied, the date selected by the court was erroneous. It has argued only that the applicable statute of limitations was the statute for indemnity claims. Any challenge to the date on which the statute began to run

---

**9.** The court apparently was not asked to, and did not, consider whether Parex actually made any deliveries directly to any construction site, or whether it made deliveries to a supplier who delivered to an applicator who delivered to the construction sites. No argument in that regard is raised on appeal.

**10.** Unless otherwise indicated, the Court shall cite to Maryland Code Annotated, Commercial Law Volume I (2002 Repl. Vol. 2006 Supp.) for §§ 1–101 through 10–112 and to Volume II (2005 Repl. Vol. 2006 Supp.) for § 11–101 to end. The Commercial Law Volumes shall be referred to interchangeably as the UCC.

**11.** Parex asserts that the sales took place in Virginia; therefore the Virginia UCC provision is applicable. Pulte contends that the argument was not made in the trial court and therefore had been waived. In so far as the cited Maryland and Virginia UCC provisions are identical, we need not concern ourselves further with the matter.

has therefore been waived. *See* Md. Rule 8–131(a). *See also Kim v. Comptroller of the Treasury,* 350 Md. 527, 536, 714 A.2d 176 (1998) ("Statutes of limitations are not ordinarily jurisdictional, and are generally waivable ...").

## II.

### Assigned Indemnity Claims of American EIFS and American Stucco

■ Pulte pursued against Parex the assigned cross-claims of American EIFS and American Stucco, which sought indemnity and/or contribution based on various tort and contract theories. The trial court granted judgment in favor of Parex on those assigned claims at the close of Pulte's case. Pulte now challenges the trial court's decision as to the assigned indemnity cross-claims. It posits that "the Court's reasoning in [granting judgment in Parex's favor] was that, although specific evidence of monetary damage[s] had been presented ..., the jury had no way of determining how to apportion damage[s] between American EIFS and American Stucco." According to Pulte, apportionment of the damages was of no consequence since "it was undisputed that all of the EIFS was supplied by American EIFS or American Stucco," which "had each assigned their indemnity claims to Pulte." Pulte adds that, in any event, it presented evidence from which the jury could have concluded that all of the Barrier EIFS in question was supplied by American EIFS, in that, at the relevant times, American Stucco had not yet been formed.

Preliminarily, although neither party presses the matter on appeal, it is apparent that the trial court acted inconsistently in permitting the assigned cross-claim of American Stucco against Parex to proceed to trial via the assignment to Pulte. To reiterate, prior to trial the court granted American Stucco's motion for summary judgment on all claims against it by Pulte, on the ground that American Stucco "did not exist as a properly-formed entity until after the time that the subject Barrier EIFS homes were built ...." That is, the trial court determined that American Stucco as a corporate entity could

not be liable to Pulte because American Stucco was *not* a corporate entity at the relevant times.

For the same reason that American Stucco, as a corporate entity, could not be held liable to Pulte, American Stucco as a corporate entity could have had no viable cross-claim against Parex. Pulte's pursuit of such an assigned cross-claim would have been nonsensical. The only viable, assigned cross-claim by a Barrier EIFS supplier against Parex would have been that of American EIFS.

The trial court permitted the assigned cross-claims of both American EIFS and American Stucco to proceed to trial but, at the close of Pulte's case, granted Parex's motion for judgment as to both claims. The court stated:

> Now, my analysis of the indemnification action, as it related to American Stone and Stucco, is that, undoubtedly, Pulte contracted with an entity known as ... CSS, LLC, and that CSS, LLC dealt with an entity known as American Stone and Stucco, sometimes referred to as American Stone and Stucco Limited Liability Corporation. As the history of this case will show, American Stone and Stucco was dismissed, because they were not incorporated until after the events of the dispute between the parties. Consequently, the corporate entity is out of the case.

> The question then becomes with what entity was CSS dealing, and it was, in turn, dealing with, apparently, an entity calling itself American Stone and Stucco probably intending to become incorporated, and probably operated by one of the Franks, and it would only be upon the claim of that individual doing business as American Stone and Stucco that any further indemnification could be made. So, notwithstanding the argument that some of these corporations are successors to one another, the Court finds the proof insufficient, as a matter of law, to demonstrate the continuity of the legal entity so as to permit an indemnification either from American EIFS or American Stone and Stucco, and, because we can't segregate out from the dam-

ages that have been proven up that which is solely American EIFS, the claim fails.

We reject Pulte's assertion that, because it was the assignee of both American EIFS and American Stucco, it was entitled to recover the cumulative damages of each of the cross-plaintiffs against Parex and thus was not required to specify the precise amount of damages suffered by either. As we have explained, the trial court determined that American Stucco was not a legally-formed entity; American Stone & Stucco, Inc., as an entity, simply could not be held liable to Pulte or the homeowners for damages and, thus, could not suffer loss. That is not to say that *some* entity holding itself out as American Stucco could not incur liability and damages—we state only that that entity could not be American Stone & Stucco, Inc.

 Nevertheless, there was evidence, as Pulte contends, from which the jury could have inferred that all of the Barrier EIFS in question was supplied by American EIFS alone. The homes were built between 1994 and 1998. Peter Harrison, who was responsible for Parex's "technical services and the technical development of its products," testified that from 1994 until 1999, American EIFS was the exclusive distributor for Parex in the Maryland and Virginia territory. There was also evidence that vaguely suggested that, prior to the formation of American Stucco in 2000, American EIFS sometimes operated under the name American Stucco.

Thus, although we perceive an inconsistency in the trial court's decision to allow the assigned indemnity cross-claim of American Stucco to proceed to trial, we also conclude that the court erred by granting Parex's Motion for Judgment, at the close of Pulte's case, as to the assigned, indemnity cross-claim of American EIFS. Whether all of the Barrier EIFS was distributed by American EIFS, and if so, the amount of damages incurred by American EIFS, were questions for the jury to resolve.

 We find no merit in Parex's argument that Pulte could not recover on the assigned cross-claim because Ameri-

can EIFS admitted to negligence.[12] To be sure, a document titled "Stipulation Regarding Consent Judgment Against Defendants CSS, L.L.C., Coronado Corporation, and American EIFS Stone & Stucco Supply, Inc." was filed in the trial court along with the settlement agreement. In that document, American EIFS admitted "to the allegations included in Pulte's remaining counts against it in the Third Amended Complaint," as well as "to the allegations contained in CSS's Cross–Claim against American EIFS," both of which included counts for negligence.

Although not clearly characterized in the cross-complaint, the parties agree that American EIFS's indemnity claim against Parex was an implied indemnity claim based on allegations that Parex was negligent and breached its contract with American EIFS as well as its attendant warranties. We shall assume, without deciding, that an admission of negligence could negatively impact upon an implied indemnity claim based on breach of contract. We are nevertheless satisfied that the extent of the impact would be a question for the trier of fact and could not be resolved as a matter of law.

In *Max's of Camden Yards v. A.C. Beverage*, 172 Md.App. 139, 152, 913 A.2d 654 (2006), we made clear that, even when an implied indemnity claim is based on an allegation of negligence, negligence on the part of the party seeking indemnification will not necessarily bar his or her recovery. We explained, "Generally, if more than one tortfeasor is found liable to a plaintiff, and one of them is found to be passively negligent, the passively negligent tortfeasor has a right of

---

12. Parex also asserts that, in the settlement agreement, American Stucco admitted liability as to the cross-claim against it by CSS. Parex posits that this admission of liability precludes American Stucco, and thus Pulte, from recovering from Parex. We are offered no explanation as to why the settlement agreement included American Stucco's bald admission of liability to CSS, and we are at a loss to explain why, after the trial court determined on summary judgment that it "did not exist as a properly formed entity until after the time that the subject Barrier EIFS homes were built," American Stucco would admit to liability for alleged actions that occurred prior to its legal existence. In any event, the matter has no bearing on our resolution of this issue.

implied indemnity against an actively negligent tortfeasor."
*Id.* at 142, 913 A.2d 654.

The basis for implied indemnity is the concept "that one person is unjustly enriched at the expense of another when the other discharges liability that it should be his responsibility to pay. . . ." Generally, implied indemnity is dependent on the relationship between the alleged tortfeasors or the nature of their respective acts.

Frequently occurring situations in which a right to implied indemnity between tortfeasors has been recognized include a tortfeasor liable (1) vicariously for the conduct of another, (2) for failing to discover a defect in a chattel supplied by another, (3) for failing to discover a defect in work performed by another, and (4) for failing to discover a dangerous condition on land created by another.

. . . [The] right to implied indemnity exists[, *inter alia,]* when there is disparity between the levels of fault of each tortfeasor that produces an unjust result, and the less culpable tortfeasor, said to be passively or secondarily negligent, pays or is held liable for damages which are properly attributable to the conduct of the more culpable co-defendant, who is primarily or actively negligent.

*Id.* at 148, 913 A.2d 654 (citations omitted). *See also Franklin v. Morrison,* 350 Md. 144, 154–58, 711 A.2d 177 (1998). *See also Pulte Home Corp. v. Parex, Inc.,* 265 Va. 518, 579 S.E.2d 188, 193 (2003) (an unrelated case between the parties to the instant appeal which demonstrates that, under Virginia law, a claim for implied or equitable indemnification is cognizable when one party is responsible for damages caused by the negligence of another). At the same time, " '[i]t is well established under Maryland law that one who is guilty of active negligence cannot obtain tort indemnification,' regardless of whether the alleged tortfeasor from whom indemnity is being sought was actively negligent." *Max's of Camden Yards,* 172 Md.App. at 149, 913 A.2d 654 (quoting *Franklin,* 350 Md. at 149, 711 A.2d 177).

Here, it was for the jury to determine whether Parex was primarily responsible for the damages ascribed to American EIFS via the settlement agreement.

## III.

### Pulte's Breach of Express Warranties
### Claim Against Parex

In its second amended complaint, Pulte included a count against Parex for breach of express warranties. In pertinent part, the complaint alleged:

50. Parex expressly warranted, *inter alia*, that the EIFS it manufactured was free from defects and could be properly installed on homes built by [Pulte]. Upon information and belief, Parex issued both written and oral warranties to American EIFS, American Stucco, Coronado, CSS or a similar such entity, under which [Pulte] and the Homeowners are entitled to recover as a direct or intended beneficiary, as well as to some o[r] all of the Homeowners. Parex's express warranties included warranties of future performance.

\* \* \*

54. *[Pulte's] approval that Barrier EIFS be used on the Homeowners' houses was based, at least in substantial part, upon the affirmations of fact, promises, descriptions, and/or use of samples and/or models regarding the appearance, durability, and/or resistance of the Barrier EIFS product by Parex,* Coronado, CSS and Bernard Franks, which constitute express warranties, including warranties of future performance, within the meaning of the Maryland and Virginia commercial codes. These warranties were untrue, and were breached as such.

(Emphasis added.)

The trial court dismissed the breach of express warranties count with prejudice, explaining that "there [was] no showing of a representation or warranty made by Parex to

Pulte or the homeowners" and, in any event, "there was no privity between Parex and Pulte or the homeowners...." Pulte now argues that the court erred in requiring a "showing of a representation or warranty" prior to trial. It further argues that the court's dismissal on the ground that there was no privity of contract reflects an application of the economic loss rule, which does not properly apply to breach of warranty claims.[13]

The parties tacitly agree on appeal that Maryland or Virginia law would be applicable to Pulte's breach of express warranties claim, depending upon where the particular home that required repair was located. Both Maryland and Virginia have adopted the following UCC provision regarding express warranties:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant"

---

13. The economic loss rule ordinarily prevents a plaintiff from pursuing a tort action to recover "purely economic losses-losses that involve neither a clear danger of physical injury or death, nor damage to property other than the product itself." *Morris v. Osmose Wood Preserving*, 340 Md. 519, 529, 667 A.2d 624 (1995). The rule is supplanted only when the plaintiff passes the "legal threshold of pleading the existence of a clear and extreme danger of death or serious personal injury." *Id.* at 536, 667 A.2d 624. We perceive no indication from the record that the trial court applied the economic loss rule—a rule pertaining only to tort law—to this breach of warranties claim.

or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Md.Code Ann., Com Law I § 2–313; Va.Code Ann. § 8.2–313.

 Both states have also adopted an exception to the contractual privity requirement that is generally applicable to breach of express or implied warranty actions. *See generally Frericks v. GMC.*, 278 Md. 304, 309–10, 363 A.2d 460 (1976) (discussing contractual privity requirement in breach of warranty cases and statutory changes thereto). Under Maryland law:

A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home or any other ultimate consumer or user of the goods or person affected thereby if it is reasonable to expect that such person may use, consume or be affected by the goods *and who is injured in person* by breach of the warranty. A seller may not exclude or limit the operation of this section.

Md.Code Ann., Com Law I § 2–318. As the Court of Appeals explained in *Morris v. Osmose Wood Preserving*, 340 Md. 519, 546, 667 A.2d 624 (1995), in addressing a claim for breach of an implied warranty of merchantability, § 2–318 abrogates "horizontal privity" for "foreseeable consumers or users of the product" who are " 'injured in person.' " [14]

Virginia law provides:

---

**14.** Pulte's also contends that it was not required to be in privity of contract with Parex as to the Maryland homes in light of Md.Code Ann., Com. Law I § 2–314(1)(b), which has abolished "[ a] ny previous requirement of privity ... as between the buyer and the seller in any action brought by the buyer." This contention regarding so-called "vertical privity" is unavailing. "Section 2–314, which subsection ·(1)(b) modifies, is the statutory enactment of an implied warranty of merchantability, while the statutory enactment regarding express warranties is set forth in § 2–313. Because subsection (b) is contained in § 2–314, ... it eliminates the requirement of privity *only* for claims of

Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer or seller of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods; . . .

Va.Code Ann. § 8.2–318. (emphasis added).

Although the Virginia provision does not specifically state that a plaintiff who is not in privity with the manufacturer or seller must suffer personal injury in order to recover, it has nevertheless been established that that is the case. The Supreme Court of Virginia has explained that § 8.2–318 blocks "the ability to raise the common law requirement of privity as a defense." *Beard Plumbing & Heating, Inc. v. Thompson Plastics, Inc.*, 254 Va. 240, 491 S.E.2d 731, 734 (1997). The court pointed out that a more specific provision, § 8.2–715(2)(a), "requires a contract between the parties for recovery of consequential economic loss damages" in a breach of warranty claim. 491 S.E.2d at 734. Indeed, in another case between Pulte and Parex arising from the use of Barrier EIFS on homes in Virginia, the Supreme Court of Virginia relied on *Beard Plumbing & Heating, Inc.* in determining that damages to homes resulting from the use of Barrier EIFS were consequential damages as to Pulte, and that privity was required for Pulte to recover those damages from Parex. *See Pulte Home Corp.*, 579 S.E.2d at 191–92.

 Pulte was not, at the pleading stage, required to make an evidentiary "showing" that there was an express warranty. Pulte *was*, however, required to set forth an "averment" that was "simple, concise, and direct," and that

---

breach of implied warranty of merchantability." *Copiers Typewriters Calculators, Inc. v. Toshiba Corp.*, 576 F.Supp. 312, 323 (D.Md.1983). "Maryland does not recognize [an] exception to the privity requirement when the claim of breach of express warranty does not involve a claim of personal injury . . . ." *Id.*

contained "such statements of fact as may [have been] necessary to show the pleader's entitlement to relief. . . ." Md. Rule 2–303(b). It was required to include in its complaint "a clear statement of the facts necessary to constitute a cause of action" for breach of express warranty. Md. Rule 2–305. In a breach of express warranty action, a plaintiff must set forth the "terms and conditions of the warranty. . . ." *Thomas v. Ford Motor Credit Co.*, 48 Md.App. 617, 624, 429 A.2d 277 (1981). "To establish an express warranty by affirmation, promise, description or sample," the plaintiff must set forth allegations that would establish that "the representation . . . form[ed] the basis of the bargain." *Id.*

Pulte did not allege in paragraph fifty of its Second Amended Complaint that Parex made any written representation directly to *it* that constituted an express warranty. Without an allegation of personal injury, it could not recover on the claims governed by Maryland law or the claims governed by Virginia law based on any "written and oral warranties to American EIFS, American Stucco, Coronado, CSS or a similar such entity."

Pulte did allege in paragraph fifty-four of the complaint that it approved the use of Parex's Barrier EIFS based on "affirmations of fact, promises, descriptions, and/or use of samples and/or models regarding the appearance, durability, and/or resistance of the Barrier EIFS product by Parex" and the other defendants. The language used did not reveal any facts that would support the claim, however, but merely set forth a legal conclusion. *See Pulte Home Corp.*, 579 S.E.2d at 190 (in other Virginia case involving same parties, dismissal of Pulte's cross-claim for breach of express warranty was proper in that Pulte's allegation, that it approved the use of Barrier EIFS based on express warranties of Parex given "by way of affirmations of fact, promises, descriptions, and/or use of samples and/or models regarding the appearance, durability, and or water-resistance of [EIFS]," merely "parroted the language of Code § 8.2–313" and set forth legal conclusions but did not identify any supporting facts).

█ A trial court has discretion to dismiss a claim with prejudice if it fails to state a claim that could afford relief. *See* Md. Rule 2–322(b)(2). *See, e.g., Porterfield v. Mascari II, Inc.,* 374 Md. 402, 414, 823 A.2d 590 (2003); *Heist v. E. Sav. Bank, FSB,* 165 Md.App. 144, 148, 884 A.2d 1224 (2005). In light of the extensive history of litigation between the parties and, given that the dismissed count was from the Second Amended Complaint in this case and that the complaint that initiated the case was filed nearly five months earlier, we believe that the court properly exercised its discretion by dismissing the breach of express warranties claim with prejudice.

## IV.

### Pulte's Breach of Implied Warranties Claim

In Count four of its Third Amended Complaint, Pulte set forth a claim for breach of implied warranties against all of the defendants, including Parex. Pulte alleged in pertinent part:

76. Parex, American EIFS, American Stucco, Coronado and CSS, at various points in the chain of distribution, sold to [Pulte] the Barrier EIFS product used in the construction of the Homeowners' houses built by [Pulte].... Each of these Defendants impliedly warranted that the Barrier EIFS was merchantable in all respects.

77. In fact, the Barrier EIFS system was not merchantable at the time of the sale. Rather, the Barrier EIFS system traps moisture on the underlying surfaces of the structure of the homes, resulting in wood rot and other property damage. This defect, in addition to those encompassed within and reflected by Paragraph 26, constitutes a breach of the implied warranty of merchantability within the meaning of the Maryland and Virginia codes.

\* \* \*

80. Parex, American EIFS, American Stucco, Coronado and CSS, at various points in the chain of distribution, sold to [Pulte] the Barrier EIFS product used in the construc-

tion of the Homeowners' houses built by [Pulte] at the subdivisions.... Each of these Defendants impliedly warranted that the Barrier EIFS was fit for a particular purpose, to wit, for use in residential construction, and specifically on the homes to be constructed in these subdivisions, including the Homeowners' homes.

81. Each of these Defendants knew or should have known of the purpose for which the Barrier EIFS product was to be used. Additionally, Coronado and CSS knew or should have known that [Pulte] was relying on their skill and judgment in selecting and furnishing the particular Parex Barrier EIFS product.

82. In fact, the Barrier EIFS system was not fit for this particular purpose at the time of sale. Rather, the Barrier EIFS system traps moisture on the underlying surfaces of the structure of the homes, resulting in wood rot and other property damage. This defect, in addition to those encompassed within ..., constitutes a breach of implied warranty of fitness for a particular purpose within the meaning of the Maryland and Virginia commercial codes.

Prior to trial, the court granted summary judgment in favor of the defendants as to the breach of implied warranty claims.[15] Pulte now contends that the court erred in granting summary judgment as to Parex "[f]or largely the same reasons" that it erred, in Pulte's view, in dismissing with prejudice the breach of express warranties count.

Implied warranties of merchantability are set forth in § 2–314 of Commercial Law Article of this State and § 8.2–314 of the Virginia Code. Section 2–314 of the Commercial Law Article provides:

---

**15.** The order granting summary judgment as to Count 4, *inter alia,* does not set forth the basis of the trial court's decision. Neither party contends that for that reason the summary judgment therefore may not properly be reviewed. We shall assume that the court entered summary judgment for the same reason that this Court finds the summary judgment must be affirmed.

(1) Unless excluded or modified (§ 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale. Notwithstanding any other provision of this title

(a) In §§ 2–314 through 2–318 of this title, "seller" includes the manufacturer, distributor, dealer, wholesaler or other middleman or the retailer; and

(b) *Any previous requirement of privity is abolished as between the buyer and the seller in any action brought by the buyer.*

(2) Goods to be merchantable must be at least such as

(a) Pass without objection in the trade under the contract description; and

(b) In the case of fungible goods, are of fair average quality within the description; and

(c) Are fit for the ordinary purposes for which such goods are used; and

(d) Run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and

(e) Are adequately contained, packaged and labeled as the agreement may require; and

(f) Conform to the promises or affirmations of fact made on the container or label if any.

Md.Code Ann., Com. Law I § 2–314 (emphasis added).

The corresponding Virginia provision states:

(1) Unless excluded or modified (§ 8.2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed whether on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

Va.Code Ann. § 8.2–314.

Implied warranties of fitness for a particular purpose that are identical to each other are set forth in § 2–315(1) of Maryland's Commercial Law Article and § 8.2–315 of the Virginia Code, which provide:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select of furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

Md.Code Ann., Com. Law I § 2–315(1); Va.Code Ann. § 8.2–315.

In urging this Court to affirm the award of summary judgment, Parex, arguing that the issue must be resolved using Virginia law, asserts:

CSS and Coronado, both Virginia entities, purchased from American EIFS or American Stone & Stucco in Virginia.... Pulte contracted with CSS and Coronado. There was a chain of contractual relationships, but none directly between Parex and Pulte. Because all of the elements capable of supporting the implied warranty occurred in Virginia, Virginia law applies.

Parex thus hopes to avoid application of § 2–314(1)(b) of Maryland's Commercial Law Article which, as we explained in footnote 14, abolishes the privity requirement for purposes of the implied warranty of merchantability. We need not and shall not determine, at this juncture, which State's law is applicable because, as we shall explain, affirmance is required under the laws of both States.

Parex also urges this Court to accept that the American EIFS product was not a "good" within the meaning of the UCC by the time it reached Pulte or the homeowners because, at that point, it had been incorporated into the homes. We shall accept Pulte's contention that it intended that its breach of implied warranty claims spring from the sales of the synthetic stucco product when it was still movable, before it was incorporated into the homes. We shall thus assume, without deciding, and assessing no detriment to Parex, that at the relevant times, the product *was* a good as defined by Md.Code Ann., Com. Law I § 2–105(1), and Va.Code Ann. § 8.2–105(1).

■ Paragraphs seventy-six and seventy-seven of Count Four set forth the pertinent allegations regarding the breach of implied warranty of merchantability claim. In paragraph seventy-six, Pulte asserted, in essence, that an implied warranty of merchantability accompanied the "Barrier EIFS product" and the implied warranty extended through the "chain of distribution" from Parex to Pulte. In paragraph seventy-seven, Pulte asserted that the "Barrier EIFS system" was not in fact merchantable and that the implied warranty of merchantability had, thus, been breached because the "Barrier EIFS system traps moisture on the underlying surfaces of the structure of the homes, resulting in wood rot and other property damage."

Pulte's allegations as to merchantability clearly relate to the product as incorporated into the homes and not to the product as it existed at the time of the relevant sales. As we have indicated, in arguing that the product was a "good" at the relevant times, Pulte itself insists that the relevant times were

the sales of Barrier EIFS product, prior to its incorporation into the homes. Pulte's complaint included no allegation that the product itself was unmerchantable. Rather, paragraph seventy-seven suggested only that, once the product was installed in the homes it became unmerchantable. On these allegations, the trial court correctly determined that, as a matter of law, Parex was entitled to judgment on the breach of implied warranty of merchantability claim.

In truth, paragraphs seventy-six and seventy-seven suggested only that the Barrier EIFS product was not fit for the particular purpose for which it was used. Pulte set forth more specific allegations as to breach of the implied warranty of fitness for a particular purpose in paragraph eighty through eighty-two of Count Four, also quoted above. Unfortunately for Pulte, however, neither Maryland nor Virginia has expressly waived the vertical privity requirement for a claim of breach of the implied warranty of fitness for a particular purpose, as Maryland has done with § 2–314(1)(b) for a claim for breach of the implied warranty of merchantability. *See* Md.Code Ann., Com. Law I § 2–318; Va.Code Ann. § 8.2–318. *Cf. Copiers Typewriters Calculators,* 576 F.Supp. at 323.

The Court of Appeals has suggested that "privity itself is not a required element [of a breach of the implied warranty of fitness for a particular purpose] that must be shown independently," and that in order to establish such a breach a plaintiff need only prove that "the buyer had a particular purpose known to seller[.]" *Ford Motor Co. v. General Accident Ins. Co.,* 365 Md. 321, 345, 779 A.2d 362 (2001). Pulte offered nothing more than bald allegations in its complaint that Parex and the other defendants "impliedly warranted that the Barrier EIFS was fit for a particular purpose, to wit, for use in residential construction, and specifically on the homes to be constructed in these subdivisions, including the Homeowners' home," and that the defendants "knew or should have known of the purpose for which the Barrier EIFS product was to be used." Pulte directs this Court to no specific portion of the record extract that would establish that Pulte proffered evi-

dence to the trial court, in support of its opposition to Parex's motion for summary judgment, that indicated that at the time of the relevant sales Parex was aware of the particular purpose for which the Barrier EIFS in question would be used.

## V.

### Tort Claims

In the factual allegations in its Third Amended Complaint, Pulte alleged in pertinent part:

> Beginning in late 1998, certain Homeowners learned that moisture had penetrated and become trapped behind their homes' exterior cladding. Because of the design of the Parex Barrier EIFS system which provided no means of egress for water that penetrates the system, the trapped moisture caused damage to the homes, including parts of the homes apart from the Barrier EIFS itself, most frequently the substrate to which the Barrier EIFS system was attached.

Pulte thereafter set forth various tort counts, in its own capacity and as assignee of the homeowners. Count Six alleged that Parex negligently designed the Barrier EIFS and was liable to Pulte and the homeowners based on a negligence theory and/or was strictly liable because the Barrier EIFS "contained an inherently defective condition." Count Seven alleged that Parex and the other defendants negligently failed to warn Pulte and the homeowners of "the defects and deficiencies of the Barrier EIFS" and, again, was liable on a theory of negligence and/or strict liability. In Count Nine, Pulte alleged that Parex and the other defendants made negligent misrepresentations to Pulte and the homeowners regarding the Barrier EIFS.

Prior to trial, the court granted summary judgment in Parex's favor as to, *inter alia,* Counts Six, Seven, and Nine. The parties agree that the trial court's decision was based on its application of the economic loss rule. As we explained *supra,* the economic loss rule "prohibits a plaintiff from recov-

ering in tort for purely economic losses—losses that involve neither a clear danger or physical injury or death, nor damage to property other than the product itself." *Morris*, 340 Md. at 529, 667 A.2d 624.

> The rule prevents tort recovery when a product defect has resulted in the loss of the value or use of the thing sold or has caused the buyer to incur the cost of repair, and thus acts as a shorthand means of determining whether a plaintiff is suing for injuries arising from the breach of a contractual duty to produce a product that conforms, in terms of quality of performance, to the parties' expectations, or whether the plaintiff seeks to recover for injuries resulting from the breach of a duty, arising independently of the contract, to produce a nonhazardous product that does not pose an unreasonable risk of injury to persons or property. Accordingly, the rule is an attempt to define the contours of duty.

63B Am.Jur.2d *Products Liability* § 1912 at 458 (1997) (footnotes omitted).

Pulte argues that the trial court's application of the economic loss rule was erroneous, and urges this Court to reverse the trial court's decision as to the three tort counts against Parex. In Pulte's view, "there was clear evidence that other property [in the affected homes] had been damaged by a defect in the product sold by Parex...."

The history of the economic loss rule has been summarized as follows:

> The responsibility of a contracting party to a third person with whom he has made no contract for physical injuries and physical harm to tangible things resulting from dangerous conditions of things supplied, repaired, or constructed has a long history[16] ... There is no problem about tort

---

16. It is undisputed that neither Pulte nor the homeowners were in privity of contract with Parex. Rather, Parex allegedly contracted with American EIFS or American Stucco to supply the EIFS product, and American EIFS or American Stucco allegedly in turn contracted with Coronado or CSS to install the product on the homes.

liability to third parties for the mismanagement of things such as driving a car or flying an airplane. The mere fact that the defendant may be engaged in performing a service pursuant to a contract and transaction is completely irrelevant on his duty toward those in the vicinity of danger of his activity. Moreover, it is clear that parties to a contract cannot alter or modify any preexisting duty owed to third parties as regards the management of dangerous forces. But when defendant was acting, pursuant to a contract, in building, supplying or repairing things, it was not perceived at first that there could be a duty other than to the person with whom he was dealing. The first obstacle which arises is the fact that there has been no direct transaction between the plaintiff and the defendant, which usually is expressed by saying that they are not in "privity" of contract. There is thus no logical basis upon which the one may be required to perform the contract for the other unless the contract has been made expressly for the benefit of the plaintiff, or it has been assigned to him.

In other words, the absence of "privity" between the parties makes it difficult to impose any duty to the plaintiff upon the contract itself. But by entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person.

\* \* \*

... The requirement of privity of contract has been abandoned as a basis for recovery by third parties for physical harm to themselves and tangible things against those who negligently supply, repair, or construct things so as to leave them in an unreasonably dangerous condition. Moreover, strict liability has been extended to those who

sell or lease houses with defects of a kind that subject users and others to an unreasonable risk of harm. Such strict liability has not, however, been extended generally against contractors who build houses on land owned by others and who repair products or buildings pursuant to contracts made with the owner or possessor of things.

W. Page Keeton, *Prosser & Keeton on the Law of Torts* § 93 at 667–68 (5th ed.1984) (footnotes omitted).

In Maryland:

Losses related to product liability claims may be categorized generally as (1) personal injuries, (2) physical harm to tangible things, and (3) intangible economic loss resulting from the inferior quality or unfitness of the product to serve adequately the purpose for which it was purchased.... Historically, a purchaser suffering only economic loss has ordinarily been unable to bring a tort action for negligence or in strict liability; such purchasers have been limited to contract actions for breach of warranty or, in the case of fraud, a tort action for deceit.... However, purchasers claiming physical injury or harm to tangible things generally may recover under negligence or strict liability in tort and breach of warranty theories.

*A.J. Decoster Co. v. Westinghouse Elec. Corp.*, 333 Md. 245, 249–50, 634 A.2d 1330 (1994) (citing *Prosser & Keeton on the Law of Torts* § 101 at 707–08). "[T]ort liability is limited to situations in which the negligence causes physical harm to person or property ...." *A.J. Decoster Co.*, 333 Md. at 251, 634 A.2d 1330.

Generally, plaintiffs cannot recover in tort for losses in the third category—purely economic losses. Such losses are often the result of some breach of contract and ordinarily should be recovered in contract actions, including actions based on breach of implied or express warranties.

*Morris*, 340 Md. at 531, 667 A.2d 624 (citations omitted). The law of Virginia is identical. In construction cases in that state, a plaintiff may recover, from a defendant with which it is not in privity of contract, damages for injuries to person or

property, but not purely economic damages. *See Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.,* 236 Va. 419, 374 S.E.2d 55, 57 (1988) (citing § 8.01–223 of the Virginia Code). There is no suggestion that physical injury occurred in this case or could have occurred as the result of the allegedly defective product.

The difficulty lies in determining whether an injury constitutes physical harm to property for which tort liability will lie, or mere economic loss. As a general rule, "[e]conomic losses include such things as the loss of value or use of the product itself, the cost to repair or replace the product, or the lost profits resulting from the loss of use of the product." *A.J. Decoster Co.,* 333 Md. at 250, 634 A.2d 1330. Thus, the question in this case is whether the alleged injury affected only the Barrier EIFS itself or affected other property belonging to Pulte or the homeowners. *See, e.g., id.* at 251–52, 634 A.2d 1330 (defective switch for ventilation system in chicken houses led to deaths of 140,000 chickens and, thus, caused damage to property—the chickens—and not merely economic loss). *Compare Morris,* 340 Md. at 536, 667 A.2d 624 (where plaintiff homeowners in class action against defendant manufacturer of roofing plywood argued that case came within exception to economic loss rule in that allegedly defective plywood created unreasonable risk of death or personal injury, but plaintiff homeowners did not argue that defect caused damage to property other than plywood itself, Court of Appeals held that alleged risk of personal injury was not sufficiently severe to bring the case within the exception); *Council of Co–Owners Atlantis Condo., Inc. v. Whiting–Turner Contracting Co.,* 308 Md. 18, 32, 517 A.2d 336 (1986) (where condominium association sued architect and builders for negligence in design, inspection, and construction of building and alleged creation of unreasonable risk of death or personal injury that brought the case within exception to economic loss rule, Court of Appeals agreed but stated, "[W]e are not required to, and do not reach the question of whether a risk of property damage alone will support the recognition of

a tort duty" under the circumstances). *See generally Lloyd v. GMC.*, 397 Md. 108, 121–131, 916 A.2d 257, 265–270 (2007).

To reiterate, the economic loss rule prevents recovery for damage to property that consists only of the product itself. *See Morris*, 340 Md. at 529, 667 A.2d 624. Pulte contends that the allegedly defective Barrier EIFS caused damage not just to itself but also to the "substrate," to which it was attached, which consisted of "sheathing and framing." In response to Parex's Motion for Summary Judgment, Pulte submitted transcripts of deposition testimony suggesting that the Barrier EIFS caused rot to the structures to which it was attached.

> What constitutes harm to other property rather than harm to the product itself may be difficult to determine. A product that nondangerously fails to function due to a product defect has clearly caused harm only to itself. A product that fails to function and causes harm to surrounding property has clearly caused harm to other property. However, when a component part of a machine or a system destroys the rest of the machine or system, the characterization process becomes more difficult. When the product or system is deemed to be an integrated whole, courts treat such damage as harm to the product itself. When so characterized, the damage [cannot be recovered in tort]. A contrary holding would require a finding of property damage in virtually every case in which a product harms itself and would prevent contractual rules from serving their legitimate function in governing commercial transactions.

Restatement (Third) of the Law of Torts, Products Liability § 21 cmt. e, at 295–96 (1998) (defining harm to persons or property).

Where a component part "causes damage to the assembled product and other consequential damages, such liability as is imposed on the immediate or remote seller to the purchaser has ordinarily been based on warranty theories." *Prosser & Keeton on Torts* § 101(4) at 709. That is because "[t]he risk that a component part of the product is not suitable for use in the ... assembly of another product is a risk that sophisticat-

ed parties . . . should be free to allocate by contract." *Id.* As we indicated in Parts III and IV of our Discussion, the trial court properly granted Parex's motion to dismiss the breach of express warranties count against it and properly granted summary judgment in Parex's favor as to the breach of implied warranties count. Significantly, Pulte pursued claims for breach of express and implied warranties against *all* of the defendants. Although the trial court granted summary judgment in favor of all defendants on the breach of implied warranties count, Pulte did not appeal the ruling as to any of the defendants except Parex. Rather, it reached a settlement agreement with the other defendants. Moreover, the breach of express warranty count against the other defendants remained alive when the settlement agreement between those defendants and Pulte was reached.

Pulte presents no convincing argument that would persuade this Court that the trial court erred when it apparently determined that the Barrier EIFS was part of an "integrated whole"—a completed home—when the damage occurred, and the damage was, thus, a "harm to the product itself." Restatement (Third) of the Law of Torts, Products Liability § 21 cmt. e, at 296. As we have explained, the barrier cladding system in question consisted of fiberglass mesh affixed to the exterior covering of the homes, with insulation board affixed to the fiberglass mesh. A cement-like mixture was applied to the insulation board, and finally fiberglass fabric was embedded into the cement-like mixture. Flashing was applied in places where the cladding adjoined other materials, such as window frames and cornices, and special tapes, caulks, sealants, and insulations were used along those places.

Each system was integrated temporally and physically with the construction of a home. A system was installed as part of the construction of each home. Once installed, the system could not readily be separated from the underlying structure.

*Gunkel v. Renovations, Inc.,* 822 N.E.2d 150 (Ind.2005), is instructive, but not for the reasons urged by Pulte. In that case, the plaintiff homeowners contracted with a builder,

Renovations, Inc. (Renovations), for the construction of a home. Six months later, the plaintiffs entered into a separate contract with J & N Stone, Inc. (J & N) to install a stone and masonry exterior on the home. Ultimately, water leaked into the home through gaps in the exterior. The plaintiffs filed suit against both Renovations and J & N, and the complaint included a count against J & N for negligence. The trial court granted summary judgment in favor of J & N on the negligence count on the ground that the economic loss rule applied, but the Supreme Court of Indiana reversed.

The *Gunkel* Court's decision was based on the undisputed fact that the plaintiffs contracted separately with J & N to install the exterior, such that the exterior was not part of the finished product sold to the plaintiffs by Renovations. The court explained that, "[b]ecause the 'economic loss' doctrine permits tort recovery only for personal injury or damage to 'other property,' if property is damaged it is necessary to identify the product at issue which defines 'other property.' " *Id.* at 154. The court reasoned:

> If a component is sold to the first user as a part of the finished product, the consequences of its failure are fully within the rationale of the economic loss doctrine. It therefore is not "other property." But property acquired separately from the defective good or service is "other property," whether or not it is, or is intended to be, incorporated into the same physical object.... [W]e align ourselves with the courts that have concluded that the "product" is the product purchased by the plaintiff, not the product furnished by the defendant. The cases that have used this formulation have typically involved claims by a first user of a finished product that includes a component supplied by the defendant where the purchaser had no dealings with the defendant.

\* \* \*

Here we have the obverse situation. The Gunkels did deal directly with J & N. The same formulation of the demarcation between contract and tort remedies is control-

ling—property acquired by the plaintiff separately from the defective goods or services is "other property" whose damage is recoverable in tort. That formulation excludes from "other property" other parts of a finished product damaged by components supplied to the seller by other manufacture[r]s and imported into the seller's product. But it does make property acquired separately "other property" for purposes of the economic loss rule even if the defective product is to be incorporated into a completed product for use or resale.

*Id.* at 155–56 (citations omitted).

Applying the rationale of *Gunkel* to the facts of the instant case, it is clear that the economic loss rule bars Pulte from recovering in tort from Parex. Parex sold containers of a synthetic stucco product. Unlike the plaintiffs in *Gunkel*, neither Pulte nor the homeowners contracted with Parex for the product. Rather, Parex contracted with a supplier, which in turn contracted with an applicator, which in turn contracted with Pulte, which in turn contracted with the homeowners. Regardless of who is deemed to have been the "first user"— Pulte or the homeowners—the product reached the first user "as a part of the finished product"—the entire home—and was not separate or "other" property. *Id.* at 155. *See, e.g., Linden v. Cascade Stone Co., Inc.,* 283 Wis.2d 606, 699 N.W.2d 189, 197–99 (2005) (where the Supreme Court of Wisconsin held that the economic loss rule barred plaintiff homeowners from recovering in tort from a defendant subcontractor, with whom the plaintiffs were not in privity, for the installation of a stucco exterior that leaked). Under the circumstances, the trial court properly applied the economic loss rule to bar Pulte's recovery in tort.

## VI.

### Legal Subrogation

In Count Sixteen of its Third Amended Complaint, Pulte purported to set forth a cause of action for "legal subrogation" against all of the defendants, including Parex.

Pulte alleged that, because it had warranted to the homeowners that "the homes were constructed with quality building materials," it had been compelled to replace the leaky Barrier EIFS and repair the damages it caused. Pulte posited that in doing so it had "discharge[d] the obligations owed by Defendants to the Homeowners," and that it "became, by operation of law, subrogated to the rights and claims of such owners and . . . entitled to recover from Defendants for its discharge of their duties." The trial court granted Parex's Motion for Summary Judgment as to Count Sixteen, although it is clear that the court's decision was more in the nature of a dismissal. Pulte now argues that the court erred.

■■■■■■■ Contrary to Pulte's apparent understanding, subrogation is not a cause of action in and of itself. Rather, the doctrine of subrogation allows a party to step into the shoes of another in order to pursue a cause of action. *See Fireman's Fund Ins. Co. v. Cont'l Ins. Co.*, 308 Md. 315, 319, 519 A.2d 202 (1987). Subrogation is " '[t]he substitution of one person in the place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities.' " *Riemer v. Columbia Med. Plan, Inc.*, 358 Md. 222, 231, 747 A.2d 677 (2000) (quoting *Black's Law Dictionary* 1427 (6th ed.1990)), *superseded by statute*, 2000 Laws of Md., Ch. 569. *See also G.E. Capital Mortgage Servs., Inc. v. Levenson*, 338 Md. 227, 231, 657 A.2d 1170 (1995). As the Court of Appeals has explained:

> Subrogation is founded upon the equitable powers of the court. It is intended to provide relief against loss and damage to a meritorious creditor who has paid the debt of another. The doctrine is a legal fiction whereby an obligation extinguished by a payment made by a third person is treated as still subsisting for the benefit of this third person. This third person succeeds to the rights of the creditor in relation to the debt. The rationale underlying the doctrine of subrogation is to prevent the party primarily liable on the debt from being unjustly enriched when someone pays his debt.

*Riemer,* 358 Md. at 231–32, 747 A.2d 677 (internal citations omitted).

■ This Court has summarized: In Maryland, there are three kinds of subrogation: 1) legal subrogation, arising by operation of law; 2) conventional subrogation, arising by an express or implied agreement; 3) statutory subrogation, created by an act of the Legislature. *Poteet v. Sauter,* 136 Md. App. 383, 401, 766 A.2d 150 (2001). The elements of legal subrogation are: (1) the existence of a debt or obligation for which a party, other than the subrogee, is primarily liable, which (2) the subrogee, who is neither a volunteer nor an intermeddler, pays or discharges in order to protect his own rights or interests. *Bachmann v. Glazer & Glazer, Inc.,* 316 Md. 405, 411, 559 A.2d 365 (1989).

Here, Pulte asks in Count Sixteen to be subrogated to the rights of the homeowners but does not, in relation to the subrogation, seek to pursue any particular cause of action against Parex. It contends that it extinguished a debt that Parex owed to the homeowners, but does not, in Count Sixteen, set forth the legal basis of the debt. Assuming, without deciding, that Pulte was neither a volunteer nor an intermeddler when it replaced and repaired the property in question, Pulte alleged nothing within Count Sixteen that would have established the first element of legal subrogation—the existence of a debt or obligation for which Parex was primarily liable.

In any event, the trial court's decision as to Count Sixteen was of little consequence to Pulte. Although it was not done in the guise of subrogation, Pulte alleged a variety of counts against Parex as assignee of the homeowners. Those counts included: breach of implied warranties; negligence and/or strict liability as to design of the Barrier EIFS; negligence and/or strict liability in failing to warn of the defects and deficiencies in the Barrier EIFS; negligent misrepresentation regarding quality of the Barrier EIFS; constructive fraud; and false advertising under Virginia law. Pulte does not suggest on appeal that it was precluded from pursuing these

claims on the ground that it was not a proper assignee of the homeowners.

## *Parex's Cross–Appeal*

As we have explained, the only claims that went to the jury were claims for breach of the implied warranty of merchantability and breach of the implied warranty of fitness for a particular purpose, both of which were originally brought by Coronado and CSS against Parex in a cross-complaint and were assigned to Pulte pursuant to the settlement agreement.[17] Judgment on those claims was entered in Pulte's favor and, in its cross-appeal, Parex now challenges that judgment on a multitude of grounds.

## I.

### Sufficiency of the Evidence as to Damages

Parex first argues that the implied warranty claims assigned by Coronado and CSS to Pulte should not have been submitted to the jury because Pulte failed to present sufficient evidence to establish: that either Coronado and CSS suffered any damages; the specific amount of the damages suffered by Coronado as opposed to CSS; or whether the Barrier EIFS was sold by American EIFS or American Stucco, and whether it was sold to Coronado or CSS.

Preliminarily, we are not persuaded by Parex's argument that Pulte failed to establish that Coronado and CSS suffered damages. It is true that "[d]amages must be

---

17. We explained in addressing the first argument in Pulte's appeal that neither Coronado, CSS, or Pulte ever filed against Parex specific claims for breach of an implied warranty of merchantability or breach of an implied warranty of fitness for a particular purpose. Rather, Coronado and CSS each filed claims against Parex seeking indemnity and/or contribution for breach of implied warranties, and Pulte pursued those claims as assignee of Coronado and CSS. Parex did not argue in the trial court and does not argue on appeal that, for that reason, the trial court erred in permitting the breach of implied warranty claims to proceed. Thus, Parex has waived any challenge to the claims on that basis.

proven with reasonable certainty, or some degree of specificity, and may not be based on mere speculation or conjecture." *Zachair, Ltd. v. Driggs,* 135 Md.App. 403, 427, 762 A.2d 991 (2000) (quoting 8 Maryland Law Encyclopedia, *Damages* § 193 at 159 (1985) (footnotes omitted)). In this case, however, it appears that Pulte refrained from presenting evidence as to the amount of the settlement agreement because the trial court specifically determined that that information should be withheld from the jury. As we shall discuss further in addressing issue IV of Parex's cross-appeal, throughout trial, the court reserved judgment on whether Pulte would be permitted to recover from Parex the amount of the consent judgment entered against Coronado and CSS, or would be limited to the amount of the settlement agreement. The court opined that the issue of limiting any award to Pulte to the amount of the settlement "is a post-trial issue, because it requires the interplay of legal circumstances which are not a matter of evidence to the jury, and it is a matter to be adjudicated by this Court, I think, if it becomes necessary, as a post-trial consideration." [18]

Pulte presented evidence that it entered into subcontracts that required Coronado and, as shall be explained, CSS, as Coronado's successor, to install Barrier EIFS in the homes. Pulte further presented evidence that the Barrier EIFS installed by Coronado and CSS was defective and leaked and that Pulte spent $3,800,000 to replace the systems and to repair the resulting damages. The jury was informed that Pulte filed suit against Coronado and CSS, among others, to

---

**18.** We reject Parex's assertion that Pulte is not entitled to recover any amount because it did not prove what portion of the $725,000 settlement agreement, if any, was paid on behalf of Coronado and CSS. As we shall discuss further in Part IV of our discussion as to the Cross–Appeal, the liability of the defendants in regard to the settlement agreement with Pulte was joint and several. Absent proof from Parex that some or all of the settlement obligation to Pulte was satisfied and no longer remained a debt for which Coronado and CSS, as well as the other settling defendants, were jointly and severally liable, Pulte—as assignee of Coronado and CSS—was entitled to recover the entire amount from Parex.

recover its costs, and that Coronado and CSS in turn filed suit against Parex. Although the settlement agreement itself was not entered into evidence, the jury was informed that Coronado and CSS assigned their claims against Parex to Pulte.

In *Hooton v. Kenneth B. Mumaw Plumbing & Heating Co., Inc.*, 271 Md. 565, 573, 318 A.2d 514 (1974), a case involving the breach of an express warranty in installing a heating and air conditioning system, the Court of Appeals explained that " '[t]he measure of damages in a case such as this ... is that amount of money which will render that which is guaranteed to be as warranted.' " (Citation omitted.) In *Hall v. Lovell Regency Homes Ltd. P'ship*, 121 Md.App. 1, 12–13, 708 A.2d 344 (1998), which involved breach of implied warranty claims against builders, this Court elaborated, "[i]n a breach of contract action for defective performance of a real estate construction contract, the primary measure of damages is the cost of repairing or remedying the defect."

On the evidence before it, the jury properly determined that Coronado and CSS *could* be held liable to Pulte, on a breach of implied warranty theory, for the $3,800,000 Pulte spent to repair the defective systems and the damages they caused.[19] The fact that Coronado and CSS had settled with Pulte and never paid that amount is inconsequential in light of the trial court's decision to withhold that information from the jury.

We are not persuaded that Pulte was required to distinguish between the damages suffered by CSS and the damages suffered by Coronado. Pulte introduced into evidence its subcontract agreement with Coronado, showing that Pulte hired Coronado to apply "stucco" to the exteriors of the homes. Michael Walker, the Northeast Area Vice President for Product Development for Pulte, testified to the effect that,

---

**19.** Parex suggests in its appellee/cross-appellant's brief that, in attempting to prove the amount of damages suffered by Coronado and CSS, Pulte improperly relied on the amount of the consent judgment entered against them. As Pulte points out in its reply/cross-appellee's brief, however, the amount of the consent judgment, like the amount of the settlement, was never introduced into evidence.

although Coronado was named in the agreement as the sub-contractor, Coronado and CSS were the same company. Rob Fisher, who was Pulte's Vice President of Customer Relations, clarified that at some point while the subcontract was in effect Coronado "became known as CSS," and that Bernard Franks remained owner. Walker indicated that Coronado and CSS were certified or otherwise trained by Parex. He added that they supplied the Barrier EIFS, made by Parex, for the project. On this testimony, the jury readily could have concluded that Coronado and CSS were one and the same. *Cf. Acad. of IRM v. LVI Envtl. Servs., Inc.*, 344 Md. 434, 451, 687 A.2d 669 (1997) (explaining that successor liability will exist where the "successor entity is a mere continuation or reincarnation of the predecessor entity . . . ." (citations and internal quotations omitted)).

Parex's argument that the evidence regarding damages was insufficient because Pulte failed to establish, as to each home, whether Coronado or CSS purchased the Barrier EIFS from American EIFS or American Stucco is utterly without merit. Pulte presented evidence that Coronado was the successor entity to CSS, and that American EIFS and American Stucco were the exclusive regional distributors of the Parex product. The president of Parex, Fransua Bouan acknowledged that Coronado and CSS applied "the Parex Barrier EIFS on the homes that are at issue in this litigation." There was simply no dispute that the product in question was a Parex product and was purchased by Coronado or CSS from one of the two suppliers. For purposes of this issue, the identity of the particular supplier was of no consequence.

On this record, we are satisfied that there was sufficient evidence to support the $3,800,000 award, which we are constrained to reduce as a matter of law in light of the settlement. We reiterate that the trial court expressly sanctioned withholding evidence as to the amount of the settlement, as the court had not yet decided whether Pulte was limited to recovering that amount.

## II.

### Privity Between Applicators and Parex

 Parex next contends that the trial court erred by failing to determine that Coronado and CSS could not have recovered on their cross-claim against Parex for breach of the implied warranty of fitness because there was no privity of contract or its equivalent between the applicators and Parex. Parex asserts that, absent such an intimate nexus between the applicators and Parex, Pulte could not, as a matter of law, recover on the assigned claim. Parex insists that, in reviewing the matter, this Court should apply Virginia law.

 Preliminarily, the argument that Virginia law is the applicable law in resolving this issue has been waived. As Pulte points out, Parex never provided notice of an intention to rely on Virginia law. A party to a proceeding in a Maryland court who intends to rely on the law of another jurisdiction is required to provide "reasonable notice ... to the adverse parties either in the pleadings or by other written notice." Md.Code Ann., Cts. & Jud. Proc. § 10–504.[20]

> Our courts have interpreted [§ 10–504] to mean that, if a party wishes to rely on a foreign law, notice should be given in the trial court so that the adverse party has an adequate opportunity to prepare his arguments on the foreign law. ... Although we may, in our discretion, take judicial notice of foreign law where the statutory notification was not given and proof of the foreign law was not presented, ... we [will] decline to do so [when] the case proceeded in the trial court on the assumption that Maryland law was applicable. ...

*Beale v. Am. Nat. Lawyers Ins. Reciprocal,* 379 Md. 643, 652 n. 5, 843 A.2d 78 (2004) (citations omitted).

Contrary to Parex's assertion, it is not sufficient that CSS filed notice of an intention to rely on Virginia law in connec-

---

**20.** Unless otherwise indicated we shall refer to Md.Code Ann., Cts. & Jud. Proc. (2006 Repl. Vol.).

tion with the claims brought by Pulte against CSS. Those claims were resolved pursuant to the settlement agreement and simply had no bearing on the applicability of Virginia law to the cross-claims brought by Coronado and CSS against Parex. In any event, Parex acknowledges on appeal that Maryland law and Virginia law on the matter in issue are substantially similar.

As we explained in Part IV of our discussion as to Pulte's appeal, the Court of Appeals commented in *Ford Motor Co.*, 365 Md. at 345, 779 A.2d 362, that, in order to establish a breach of the implied warranty of fitness for a particular purpose, "the plaintiff only needs to prove that the buyer had a particular purpose known to the seller, and that privity itself is not a required element that must be shown independently." The Court observed that, in a case such as this, where there is "an intermediate chain of owners," a plaintiff may encounter difficulty in proving that the original seller knew of the ultimate purpose for which the product in question would be used. *See id.* Parex baldly asserts that the evidence was insufficient to establish that it was aware, at the times of the relevant sales, of the ultimate, intended use by Coronado and CSS. Pulte employee Rob Fisher testified, however, that prior to executing the subcontract for application of the Barrier EIFS, he met with Bernie Franks and a Parex representative, who assured him that the planned construction projects would "work with the Parex product." On this testimony, the jury could have properly concluded that, despite the "intermediate chain of owners," Parex was well aware of the "particular purpose" to which the Barrier EIFS would be put. *Id.*

Even assuming *arguendo* that Parex is correct in asserting that Pulte was required to establish contractual privity and, in any event, failed to establish an equivalent intimate nexus, Parex's victory would be a hollow one. The jury also determined by special interrogatory that the Parex product "used in the Pulte home construction was defective." Although the jury responded "No" when asked if the "product was unfit for the ordinarily purposes for which such goods are used" (*see id.*), we are satisfied that the determination that the product

was defective was equivalent to a determination that Parex breached the implied warranty of merchantability, for which the legislature of this State has expressly waived the privity requirement.

To reiterate, *any previous requirement of privity is abolished as between the buyer and the seller in any action brought by the buyer.* *See* Md.Code Ann., Com. Law I § 2–314(b) (emphasis added).

The Court of Appeals "long has held that a plaintiff asserting a breach of the implied warranty of merchantability must prove that the product was defective." *Ford Motor Co.,* 365 Md. at 333, 779 A.2d 362. That is, "a plaintiff must prove the existence of a defect at the time the product leaves the manufacturer to recover on an implied warranty claim, as well as with regard to strict liability and negligence claims." *Id.* at 334, 779 A.2d 362. As the Court of Appeals noted in *Ford Motor Co.,* 365 Md. at 334 n. 13, 779 A.2d 362:

One treatise explains the evidentiary requirements for proving an implied warranty of merchantability claim as including proof of a defect:

For a product to flunk the merchantability test, it must contain an inherent defect. . . . The cases indicate that the courts find goods to be unfit for their ordinary purposes when they can identify one of three general types of defects: manufacturing defects, design defects, and failure to give the buyer proper instructions with respect to the goods. This tripartite test for defect is essentially the same as that required when the theory is strict tort liability under Section 402A of the *Restatement (Second) of Torts,* except that goods may violate Section 2–314 without being 'unreasonably dangerous' as is generally required under strict tort. In other words, a defect that leads to primary or consequential economic loss is actionable under Section 2–314, although it probably would not trigger strict tort recovery.

(citing Barkley Clark & Christopher Smith, *The Law of Product Warranties* paragraph 5.01[2][a] at 5–9 (1984)).

Parex does not contend that Pulte failed to present sufficient evidence to establish a breach by Pulte of an implied warranty of merchantability to Coronado and CSS. Although the jury determined that Pulte did not prove that the Barrier EIFS was unfit for the ordinary purposes for which such goods are used, there is no indication that its additional determination that the product was defective rendered the verdict irreconcilably inconsistent. *See generally Patras v. Syphax,* 166 Md.App. 67, 75–76, 887 A.2d 84 (2005). The jury's determination that the goods were defective may well have reflected a belief that the goods did not "[p]ass without objection in the trade under the contract description," or were not "of fair or average quality within the description." Md. Code Ann., Com. Law I § 2–314(2)(a) and (b). *See Bond v. NIBCO, Inc.,* 96 Md.App. 127, 139, 623 A.2d 731 (1993) ("a plaintiff who alleges breach of warranty of merchantability is not obligated to identify which factors under § 2–314(2) are breached").

## III.

### Statute of Limitations as to Four Homes

In Part I of our Discussion as to Pulte's appeal, we observed that the trial court ruled that the event that triggered the running of the statute of limitations in this case was the delivery of the Barrier EIFS product to the construction site. The court concluded that because Pulte filed the complaint that triggered the instant case on June 14, 2001, it could not recover from Parex on any breach of implied warranty claim assigned to Pulte by Coronado or CSS if the Barrier EIFS for the houses to which the claims related was delivered prior to June 14, 1997. Subsequently, the jury determined that Pulte could not recover as to forty-four of the homes because the closings on the sales of those homes occurred prior to June 14, 1997. The jury, thus, inferred that for the twenty-three homes for which closings occurred after June 14, 1997, deliveries of Barrier EIFS occurred after that date as well.

Parex now contends that the jury's decision was clearly erroneous as to four of the twenty-three homes. It asserts that the four homes were model homes and points out that it offered into evidence, as Defendant's Exhibit 24A, certificates of occupancy issued prior to June 14, 1997 for each of the homes. Parex reasons, "Since it has been established that the certificate[s] of occupancy [were] issued prior to June 14, 1997, it is evident that the Parex product . . . [was] delivered prior to that date. . . ."

 As we have indicated, "it is not the province of an appellate court to express an opinion regarding the weight of the evidence when reviewing judgment on a jury verdict." *Owens–Corning Fiberglas Corp.*, 343 Md. at 521, 682 A.2d 1143. If the party challenging the weight of the evidence properly moved for judgment at the close of the opposing party's case and, thus, specifically preserved the challenge, we will review the trial court's decision that the evidence was sufficient to send the case to the jury, "but we do not review the weight of the evidence after it has been passed upon by a jury." *Id.* (citation and internal quotations omitted). Parex does not contend that it moved for judgment as to the four homes on the ground now urged, and we have unearthed no such argument in the voluminous record extract. Under the circumstances, we deem the argument to be unpreserved.

We note, however, that no impropriety is apparent. Parex offered no testimony or other evidence to explain the purported significance of the documents in Defendant's Exhibit 24A. Parex presented no reason for the jury to believe that the Barrier EIFS was necessarily applied to the four homes before the documents were issued. Specifically, the document offered for the home at 9808 Claggett Farm Drive in Potomac, Maryland, is titled "Building Inspection Detail" and was issued by the Montgomery County Department of Permitting Services. The document indicates that the home was inspected on June 27, 1996 for the purpose of a "building residential permit." As to precisely what was inspected, the document is vague. It lists, without comment or notation, the cryptic

terms "check list pre construction," "county well inspectio[n]," "inspection detail," and "state well permit approval."

Documents titled "Certificate of Final Inspection" that were issued by the Montgomery County Department of Environmental Protection were offered for the homes at 9712 Claggett Farm Drive and 20700 Delta Drive in Potomac. These documents state that the homes were inspected and received their building permits, electrical permits, and mechanical permits on June 3, 1997 and June 13, 1996, respectively. They do not specify which, if any, of the permits pertained to the exterior coverings of the homes. Similarly, the document offered for the home at 9603 Savannah Crossing in Fairfax, Virginia is a "Residential Use Permit" issued by the Department of Environmental Management of Fairfax County. The permit indicates, without explanation, that the home underwent electrical, plumbing, mechanical, building, and public utilities inspections on June 24, 1996 and June 27, 1996. Again, there is no specific mention of the Barrier EIFS application.

 In his closing argument, counsel for Parex stated:

[O]ur contention is that if you find ... that [closing on the sale of the home] was ... more than four years before the lawsuit is filed, then it's barred by limitations.

The importance of that is, and one of the reasons that courts and statutes have periods of limitations is because memories fade, documents tend to get lost, and when you're trying to defend yourself against allegations four and five years down the road, it's hard to do if you can't gather the information and get access to it. And, so, the courts set a period beyond which you can't bring a claim. It's really undisputed what the settlement dates are here, and I think it's an easy math problem that there are only 23 homes settled after June 14, 1997 that got in within the statute of limitations period.

Now, the settlement date indicates, you know, these people went to settlement, and it's a reasonable inference that the EIFS was on the house or they wouldn't settle, which means the goods have been delivered, certainly, to

CSS. Th[at] can hardly be disputed, and there's certainly no evidence that's presented that any EIFS was delivered after this date of settlement.

So, since the statute of limitations runs from the date of delivery of the goods, we know the EIFS was at least on at this time. *Now, four of these homes are model homes. They were built long before they went to settlement. And for that reason we introduced into evidence Exhibit 24A. Now, Exhibit 24A shows you the certificates of occupancy on the four model homes, and you will be able to see that they were completed, and a certificate of occupancy issued well before June 14, 1997 ....*

(Emphasis added.) Closing argument is not evidence, however. *See generally Farley v. Allstate Ins. Co.*, 355 Md. 34, 56, 733 A.2d 1014 (1999). In any event, counsel's closing argument contained no insight into what the documents in question truly revealed. The jury's decision was supported by the evidence.

## IV.

### Effect of Settlement Agreement on Damage Award

In the fourth argument of its cross-appeal, Parex launches a two-pronged attack on the award of $1,500,000 in damages to Pulte. Parex first contends that the trial court erred by permitting Pulte to recover any damages at all on the assigned cross-claims in light of the admissions of fault made by Coronado and CSS in their settlement agreement with Pulte.[21] In the alternative, Parex argues that the court erred by permitting Pulte to recover on the assigned cross-claims an

---

21. Parex presents extensive argument for the proposition that, "[i]n order to recover indemnity, a party must be free of fault." In addressing Part I of Pulte's appeal, we explained that, at the close of Pulte's case, the trial court entered judgment in Parex's favor on the assigned indemnity cross-claims. The claims that were submitted to the jury were not assigned indemnity cross-claims. Rather, they were the underlying claims for breach of implied warranties on which the indemnity claims were based.

amount greater than the amount Coronado and CSS paid Pulte to settle Pulte's claims against them.

The first prong of Parex's argument is without merit.[22] Parex proceeds under the mistaken assumption that fault on the part of the plaintiff—in this case, apparently, negligence on the part of Coronado and CSS—precludes recovery as *a matter of course* on a breach of warranty claim as it does on a negligence claim. That is not the case. "In an action based on breach of warranty it is necessary for the plaintiff to show the existence of the warranty, the fact that the warranty was broken and that the breach of warranty was the proximate cause of the loss sustained." *Sheeskin v. Giant Food, Inc.*, 20 Md.App. 611, 620–21, 318 A.2d 874 (1974), *aff'd sub nom. Giant Food, Inc. v. Washington Coca–Cola Bottling Co.*, 273 Md. 592, 332 A.2d 1 (1975). A plaintiff may not recover for breach of warranty if the trier of fact determines that the plaintiff's own, intervening conduct, and not the breach, was " 'the proximate cause of the loss.' " *Erdman v. Johnson Bros. Radio & Television Co., Inc.*, 260 Md. 190, 200, 271 A.2d 744 (1970) (holding that even though defendants breached implied warranty of fitness, plaintiffs could not recover damages for fire in home that started when television burst into flames since plaintiffs continued watching television even after it began emitting smoke and sparks). *See also Mattos, Inc. v. Hash*, 279 Md. 371, 381–84, 368 A.2d 993 (1977) (evidence supported jury's determination that plaintiff auto body repairman did not act negligently or assume risk in using clamp purchased from defendant seller and, thus, could recover for breach of implied warranty of merchantability).

---

22. Contrary to Parex's assertion, neither CSS nor Coronado admitted fault in either the settlement agreement or the resulting consent judgment. All of the parties to the consent agreement, with the exception of American Stucco, did, however, execute and file with the court, on the day the settlement agreement was reached, a separate document titled "Stipulation Regarding Consent Judgment Against Defendants CSS, L.L.C., Coronado Corporation, and American EIFS Stone & Stucco Supply, Inc." That document stated, *inter alia*, "CSS and Coronado admit and stipulate to the allegations contained in Pulte's remaining counts against each of them in the Third Amended Complaint...."

Here, the trial court instructed the jury, in pertinent part, as follows:

Any warranty of goods involved in this case was based on the assumption that they would be used in a reasonable manner appropriate for the purpose for which they were intended. A person cannot recover damages for a breach of warranty if the injury or damages the person suffered resulted from the person's improper use of the goods unless the seller had reason to know that the plaintiff intended the improper use and nevertheless warranted that the use was acceptable....

A person using a product after the person knew or should have known of the defect or condition which the person claims was a breach of warranty may not recover unless a reasonable person would have used the product in spite of that knowledge.

In this case, the plaintiff has been assigned or otherwise acquired certain rights of other parties to bring the claims against Parex. This case concerns the rights [against] Parex that have been assigned by the suppliers and installers, Coronado Corporation and CSS, LLC. Pulte has brought suit against Parex in both of these capacities as though it were standing in the shoes of each of Coronado and CSS, LLC.

Pulte does not have a direct claim against Parex. Pulte alleges that it has taken by written agreement an assignment of all claims, if any, of CSS and Coronado against Parex as part of that agreement and as a part of that agreement, CSS and Coronado have admitted their liability to Pulte for the damages alleged in this case.

Thereafter, the jury determined, in essence, that: the Barrier EIFS sold by Parex was defective; Parex had breached the implied warranties; and the breaches by Parex were the cause of damages to Coronado and CSS in the amount $50,000 per home. Parex does not dispute the particular findings but merely contends that, because of the undefined admission of fault in connection with their settlement with Pulte, Coronado

and CSS may not recover from Parex. The jury, however, agreed with Pulte that it was Parex's breaches, and not any wrongdoing on the part of Coronado or CSS, that caused the damages. Recovery by Pulte on the assigned cross-claim was therefore proper.

██ Parex shall prevail on the second prong of its argument, however. We agree with Parex that Pulte cannot recover more damages than Coronado and CSS were, or could be, required to pay. To recount, Coronado and CSS were parties to the settlement agreement with Pulte. The essential terms of the settlement agreement were:

- the various insurers for the settling defendants agreed to pay Pulte a total of $725,000.
- the settling defendants agreed to assign their "claims, rights, and causes of action stemming from this Lawsuit to Pulte,"
- Coronado and CSS agreed to the entry of a consent judgment against them in the amount of $5,667,500.08 plus costs and reasonable attorneys' fees, and American EIFS agreed to the entry of a consent judgment against it in the amount of $5,229,300.22 plus costs and reasonable attorneys' fees,
- In exchange, Pulte agreed "not to execute on these consent judgments against Coronado, CSS, American EIFS or Defendants' Insurers," and
- Pulte further agreed to dismiss with prejudice its claims against Bernard Franks and Benjamin Franks, as well as the counts against the settling defendants for fraud, constructive fraud and negligent misrepresentation.

Pulte defends against Parex's argument by asserting that, under the "judgment rule," Pulte is entitled to recover by way of the assignment the full amount of damages suffered by Coronado and CSS even though Coronado and CSS reached a settlement agreement with Pulte and will never be required to pay that amount. Pulte reasons that, since the $3,800,000 jury award did not exceed the amount of the consent judgment entered against Coronado and CSS pursuant to the settlement

agreement, it is entitled to retain the full amount of the award. The judgment rule simply is not applicable to this case, however.

This Court has explained that the judgment rule applies if a case involves a contract that "is an 'indemnity against liability.' " *Roebuck v. Steuart,* 76 Md.App. 298, 307, 544 A.2d 808 (1988). If such a contract exists, "recovery from the indemnitor is allowed when judgment is entered against the indemnitee, even though it has not been paid. . . ." *Id.* at 307–08, 544 A.2d 808. If, however, "the contract is 'an indemnity against loss or damage' . . . . the indemnitee cannot recover from the indemnitor until payment is made or he has otherwise suffered actual loss or damage. . . ." *Id.* at 308, 544 A.2d 808. *See also* 42 C.J.S. *Indemnity* §§ 22 and 23 (1991). As the cases cited by Pulte reflect, the judgment rule most often comes into play when an insured defendant or his or her assignee pursues a claim against the insurance carrier for bad faith failure to settle. *See, e.g., Gray v. Grain Dealers Mut. Ins. Co.,* 871 F.2d 1128, 1132–33 (D.C.Cir.1989); *Gaskill v. Preferred Risk Mut. Ins. Co.,* 251 F.Supp. 66, 68–69 (D.Md. 1966), *aff'd,* 371 F.2d 792 (4th Cir.1967); *Lee v. Nationwide Mut. Ins. Co.,* 286 F.2d 295, 298 (4th Cir.1961). The insured or his or her assignee will be permitted to recover the difference between the amount of the policy limit and the amount of the judgment. *See Med. Mut. Liab. Ins. Soc'y of Md. v. Evans,* 330 Md. 1, 25, 622 A.2d 103 (1993); *Gaskill,* 251 F.Supp. at 72. The judgment rule may also be applicable in cases involving contracts of indemnity that do not involve insurance carriers. *See, e.g., Deminsky v. Arlington Plastics Mach.,* 259 Wis.2d 587, 657 N.W.2d 411 (2003) (where contract of sale expressly provided that buyer of machine would indemnify seller in any suit for damages caused by machine).

Pulte does not suggest that Parex expressly contracted to indemnify Coronado or CSS for any loss or liability resulting from the Barrier EIFS. Moreover, we have explained at length that at the close of Pulte's case the trial court dismissed the assigned indemnity claims, and the claims that

went to the jury were the breach of implied warranty claims assigned by Coronado and CSS to Pulte. We decline to expand the scope of the judgment rule to apply to situations such as this. Under the circumstances of this case, Pulte's damages must be limited to the recovery that Coronado and CSS could recover—that is, the amount they paid to settle the claims against them.

We reject Parex's suggestion that Pulte is not entitled to recover any amount because it did not prove what portion of the $725,000.00 settlement agreement, if any, was paid on behalf of Coronado and CSS. The settlement agreement clearly states, "Defendants' Insurers agree to pay Pulte $725,000.00." The agreement identifies certain insurers but makes clear, by defining "Defendants' Insurers" to include "any other insurer or companies providing insurance coverage for the time periods outlined in the Lawsuit," that some insurers may not yet have be identified. The agreement does not identify the particular parties whom each insurer insures; nor does it apportion liability among the parties. It is, thus, apparent that the payment obligation was intended to be joint and several.

> When two or more promisors agree to pay a sum of money under a contract the amount promised is the promise of all and the promisee is entitled to a joint judgment against them, or judgments against them severally. In satisfying such judgments execution may be levied upon the goods of any one of them.... Even though the judgment may be joint, the payment of the entire judgment might be satisfied from any one of them....

*Ramsey, Inc. v. Davis,* 66 Md.App. 717, 728, 505 A.2d 899 (1986) (applying objective law of contracts to consent judgment and quoting *Traylor v. Grafton,* 273 Md. 649, 684–85, 332 A.2d 651 (1975)).

It was not Pulte's burden to prove that the $725,000 settlement amount had been paid and what portion, if any, had been paid by, or on behalf of, each of the settling defendants. Rather, it was Parex's burden to prove that the settlement

had been paid, either partially or entirely. *See* Md. Rule 2–323(g) (identifying accord and satisfaction as an affirmative defense); *Wickman v. Kane*, 136 Md.App. 554, 561–62, 766 A.2d 241 (2001) (defendant bears burden of proving that payment contemplated by settlement agreement was made). Parex directs us to no evidence that it satisfied this burden. Absent proof that the settlement had been paid, it could properly be inferred that the obligation remained a debt for which Coronado and CSS remained jointly and severally liable. Pulte, as assignee of the applicators, could thus recover the full amount from Parex.

## V.

### Exclusion of Implied Warranties

Parex next contends that the trial court erred in permitting Pulte to recover on the assigned claims of Coronado and CSS for breach of the implied warranties of merchantability and fitness for a particular purpose, in that Parex expressly excluded the assigned warranties in its distributorship with American EIFS. Parex points out that the jury answered in the affirmative the question:

> Do you find by a preponderance of the evidence that Parex, Inc. has proven that a contract existed between Parex and American EIFS Stone & Stucco Supply, Inc., as represented by Parex Exhibit # 41?

In a brief argument that spans less than one page of Parex's fifty-nine page appellee/cross-appellant brief, Parex asserts that, in agreeing to the "General Conditions of Sale" which were appended to the contract and included in Exhibit 41, American EIFS "waived all warranties and agreed to indemnify Parex if suit were instituted against Parex." (Parex's brief at 53).

Parex does not indicate that it raised the argument in the trial court, and does not provide this Court with a citation to the record extract that would confirm that it did so. We decline to comb through the eight-volume, 3,876–page record extract to ascertain information that Parex should have pro-

vided—a clear reference to a page or pages of the record extract that show the matter was presented to the trial court. *See* Md. Rule 8–504(a)(4). "[A]ppellate courts are not obliged to go through the record to find where a point was actually ruled upon, if it was." *Schaefer v. Cusack,* 124 Md.App. 288, 300, 722 A.2d 73 (1998). "Under the circumstances, [we shall assume that] the matter was not raised in or addressed by the trial court and therefore is not properly before this Court for review." *Harper v. State,* 162 Md.App. 55, 88, 873 A.2d 395 (2005) (by failing to provide citations to the record to establish that appellant pursued generic motion to sever criminal counts, appellant waived right to argue on appeal that trial court erred by failing to sever the counts).

As Maryland Rule 8–131(a) provides, an "appellate court will not decide any . . . issue [other than jurisdiction] unless it plainly appears by the record to have been raised in or decided by the trial court . . . ." We see no reason to exercise our discretion to do otherwise in this case. *See, e.g., Kennedy v. Mobay Corp.,* 84 Md.App. 397, 430, 579 A.2d 1191 (1990) (appellant's argument that trial court erred by postponing the case several times was not properly before this Court where appellant "fail[ed] to provide us with a record reference to any objection to these continuances . . ."), *aff'd,* 325 Md. 385, 601 A.2d 123 (1992).

## VI.

### References to Subsequent Remedial Measures

■ Parex next contends that Pulte repeatedly and egregiously violated a trial court ruling prohibiting it from questioning witnesses or otherwise offering evidence regarding subsequent remedial measures taken in regard to its Barrier EIFS. Parex posits that "[t]he prejudicial statements were driven home time after time after time and culminated in Pulte's *'coup de grace,'* egregious violations of the court's ruling during closing." Parex concludes that the cumulative effect of the perceived violations necessitated that a mistrial be declared during closing argument.

Prior to trial, Parex moved *in limine* to bar evidence regarding "changes in regulations and manufacturers' recommendations" concerning Barrier EIFS that were made after the events in question. At the start of the hearing on the motion, the trial court commented:

Remedial measures are generally not admitted. However, if expert opinions . . . or lay opinions are expressed, that the original product was never defective or wasn't a problem, then typically the remedial measure could then be raised in an impeachment mode. And that would be my intended ruling. . . .

Upon hearing argument on the motion, the trial court stated:

. . . What I'm going to do is, I'm going to give you some guidance. I would not admit the presentation of changes in building codes that are post event, absent some showing of rel[evence] to the event and what that really means is I'm postponing it to the trial but that's how I'm going to rule. So, unless you're telling me something different, it probably isn't going to come in. Except in impeachment, you always have the right in impeachment.

Thus, Pulte was given the delicate task of proving the assigned claims of Coronado, CSS, and American EIFS—including proving the damages measured in part by the cost of replacing the product—*without* informing the jury that, after the Parex product was used on the homes in question, Parex itself or any government entity, by way of changing building codes, had taken remedial measures in regard to Barrier EIFS or barrier cladding systems in general.

As expected, the issue of subsequent remedial measures arose several times during trial. Citations to the record extract, provided by Parex, indicate that on one occasion the trial court overruled an objection by counsel for Parex to a question asking a witness to explain the difference between the Barrier EIFS used on the homes and the drainable EIFS product that replaced it. On a second occasion, after much debate at a bench conference, the court sustained Parex's

objection to a question asking Parex president Francua Bouan whether Parex no longer recommended using Barrier EIFS for residential construction. The question was clearly designed to impeach the witness after he stated, confusingly, that the product is still "installed successfully with all respect[s] to the specification in a lot of residential commercial construction."

Three times bench conferences were called to discuss whether counsel for Pulte could properly ask questions of a witness that broached the subject of subsequent remedial measures. Each time the court denied permission to ask the questions and, contrary to Parex's assertions, no evidence or improper questioning was placed before the jury. On one occasion, counsel for Pulte asked a question of a witness that elicited a response that, in accordance with current building codes, Barrier EIFS is no longer used on single-family, wood-frame, residential housing. No objection was lodged to the question or response. Parex directs us to two instances where, without objection, counsel for Pulte elicited testimony from witnesses to the effect that the replacement of the Barrier EIFS with drainable EIFS was successful. Parex also directs us to two instances that have no apparent bearing on any subsequent remedial measure.

 The citations to the record extract provided by Parex demonstrate that the perceived references to prior remedial measures during trial were far more oblique and far less frequent than Parex would have us believe. In addition, Parex may well have waived its argument, as it pertains to the admission of evidence during trial, by failing to consistently object. "Under Md. Rule 2–517, an objection to the admission of evidence must be made at the time the evidence is offered, or the objection is waived. A motion *in limine* to exclude evidence ordinarily will not preserve the issue for review if no objection is made to the introduction of the evidence at trial." *Lewin Realty III, Inc. v. Brooks,* 138 Md.App. 244, 261, 771 A.2d 446 (2001), *aff'd,* 378 Md. 70, 835 A.2d 616 (2003). Moreover, absent a continuing objection, an "appellant

waive[s] its objection to [the] admission [of testimony] by permitting subsequent testimony to the same effect to come in without objection." *State Roads Comm'n v. Bare*, 220 Md. 91, 95, 151 A.2d 154 (1959).

In any event, it is Parex's position that the references during trial combined with improper closing argument to warrant a mistrial. In his closing argument, counsel for Pulte explained that, in response to complaints from homeowners, Pulte launched an investigation and ultimately decided to re-clad the damaged homes. Counsel's argument then proceeded as follows:

> Now Pulte, as it stripped off the homes with the old cladding and replaced it with new, and what they replaced it with was a new type of cladding that gave the same appearance, so the homeowners were going to have the same look that they selected initially when they made the purchase of their home, but it has a secondary—
>
> MR. FERGUSON [ (counsel for Parex) ]: Objection.
>
> MR. McMANUS [ (counsel for Pulte) ]:—barrier.
>
> THE COURT: Basis?
>
> MR. FERGUSON: May we approach?
>
> THE COURT: Yes. Please pardon the interruption.
>
> (Bench conference follows:)
>
> MR. FERGUSON: He's just described how the homes were reclad with a new type of product with a secondary weather barrier.
>
> MR. McMANUS: Which is exactly how we were instructed to do it before, exactly what the evidence is in the case. I read it all from the transcripts.
>
> THE COURT: Well—
>
> MR. FERGUSON: That was excluded from evidence, Your Honor.
>
> THE COURT:—it was but I don't, I don't think it will—
>
> MR. FERGUSON: This is really terrible.
>
> MR. McMANUS: Stop.
>
> THE COURT: I'll give a curative instruction.

(Bench conference concluded.)

THE COURT: Ladies and gentlemen, the Court wishes to advise you that the issue that is before the Court and before you, ladies and gentlemen, for consideration is the nature of the product that is produced by Parex in this lawsuit. You need not concern yourself with whatever happened after the events that are involved and what wa[s] done methodology wise, except insofar as there was, if you reach this, an issue of cost. So you need to focus on the Parex product and the issues in accordance with the instructions. . . .

Shortly thereafter, counsel for Pulte explained that Pulte re-clad even those homes that had suffered very little water damage because increased damage was "inevitable." As counsel's argument continued, the following occurred:

Pulte stopped that risk for each and every one of its homeowners by taking the action now, by repairing the product as soon as it reasonably found out that yes we have a systemic problem, yes we are going to accept our responsibility and yes, we are going to reclad these houses to make sure that the damage does not spread.

Parex never did that. As I said earlier, Parex never even bothered to test this product at any time, to this day they still haven't done it. But, of course, as we also heard from the evidence, this is a good reason again why you know that this product is defective, and why the codes are so important, where the codes didn't really initially contemplate EIFS, they do now. You heard the testimony from Mr. Bouan, codes don't permit the use of—

MR. FERGUSON: Objection.

MR. McMANUS:—barrier EIFS any more.

THE COURT: Just a moment, please. As you heard form the testimony of Mr. Bouan[?]

MR. FERGUSON: May we approach?

THE COURT: Yes.

(Bench conference follows:)

MR. FERGUSON: Mr. McManus has just told the jury that the codes no longer permit the use of barrier EIFS on residential construction as you heard from Mr. Bouan. That was specifically excluded in the motion in limine.

THE COURT: It was.

MR. FERGUSON: And, Your Honor—

THE COURT: It was.

MR. FERGUSON:—I move for a mistrial.

THE COURT: Denied.

MR. McMANUS: May I be heard?

THE COURT: No.

(Bench conference concluded.)

THE COURT: Ladies and gentlemen, the status of building codes and what they permit or don't permit today is not before you and that's not an issue in this case. You are not to concern yourself with what the status is today. Proceed.

MR. McMANUS: Thank you, sir. Mr. Harrison also told you that Parex no longer recommends this product for use in this type of building. They just don't.

MR. FERGUSON: Objection, Your Honor, ask for instruction.

THE COURT: Well, once again it is—

MR. FERGUSON: Same issue.

THE COURT: Mr. McManus, I caution you on this most directly but again, ladies and gentlemen, it's not what the status is today. We are looking at a window of events of the time period which this Court has permitted evidence upon back in the '90s. That's what you are to concern yourselves with. What was the state of being then and what were the rights of the parties then. . . .

Finally, counsel for Pulte argued that counsel for Parex was trying to shift the blame to other, non-culpable companies such as the applicators:

He also [stated] to you that the applicators would come. He [stated] that the Parex product works fine and is not

defective. We never saw Mr. Franks, neither Ben nor Bernie Franks. We never saw a single applicator from any other company or anybody else come in and say yeah, I've applied the stuff and it's a good product. He made that promise to you. They didn't put on a single piece of evidence.

Mr. Ferguson also told you that this was Parex['s] best selling product today in 2005 used both in residential and commercial construction, our best selling product. We now know from Mr. Harrison they don't recommend it for this type of housing. ·

MR. FERGUSON: I ask for the same instruction again and I ask counsel—

THE COURT: Mr. McManus, I don't want to say this again to you. It is not what it is today. Don't refer to that to the jury.

In *Owens–Corning Fiberglas Corp., supra,* the Court of Appeals addressed an argument similar to that now made by Parex. There, as here, the appellant argued that the trial court erred by refusing to grant a mistrial "based on prejudicial events which occurred during trial and improper remarks during plaintiff's closing argument." *Owens–Corning Fiberglas Corp.,* 343 Md. at 514, 682 A.2d 1143. *Garrett, supra,* involved a suit against manufacturers and distributors of asbestos products brought by persons who suffered asbestos-related illnesses. During closing argument, plaintiff's counsel made "repeated references to murder and analogies to 'Nazis' and the 'Holocaust.' " *Id.* at 518, 682 A.2d 1143. Defense counsel demanded a mistrial and argued that the improper argument, combined with other perceived improprieties that occurred during trial, rendered a fair trial impossible. The trial court declined to grant the motion but instructed the jury to disregard the comments.

In rejecting the defendant's argument on appeal that the trial court erred, the Court of Appeals explained:

In reviewing the trial judge's denial of a mistrial motion, we will not disturb the ruling absent a clear showing of

abuse of discretion. When trial judges exercise discretion, they "balanc[e] alternative solutions and decid[e] which one to apply, in order to advance the interests of justice."

Our first question in determining abuse of discretion in denying a motion to mistrial is if and to what extent the movant was prejudiced by the denial.

" 'Where the [motion for mistrial] is denied and the trial judge gives a curative instruction, we must determine whether the evidence was so prejudicial that it denied the defendant a fair trial; that is, whether the damage in the form of prejudice to the defendant transcended the curative effect of the instruction.' "

*Id.* at 517–18, 682 A.2d 1143 (citations omitted). The court concluded, "[T]he trial judge did not abuse his discretion when he evaluated the conduct of the entire four-month trial, weighed the improper remarks against that backdrop, and determined that granting a mistrial would not be just." *Id.* at 519–20, 682 A.2d 1143.

In the instant case, Parex contends that the closing argument of Pulte's counsel reflected a deliberate attempt to inject improper information into the jury's considerations. We are not convinced. Throughout the trial, counsel for Pulte walked a fine line between attempting to establish that the Parex product was defective while at the same time complying with the court's ruling regarding evidence of subsequent remedial measures. The record reflects considerable confusion among counsel for both parties as to the precise scope of that ruling. Indeed, as counsel for Pulte pointed out to the court in response to an objection during closing argument, evidence that current building codes prohibit the use of barrier cladding on single-family, wood-frame, residential housing *had* been admitted without objection.[23]

---

23. *Lai v. Sagle*, 373 Md. 306, 818 A.2d 237 (2003), the primary case cited by Parex in support of its argument that a mistrial should have been declared, is inapposite. In that medical malpractice case, the trial court ruled at the start of trial that it would reserve ruling until after opening statements on a question as to whether the plaintiff could

■ The trial court twice instructed the jury to the effect that, in determining whether the Barrier EIFS was defective, it was not to consider any building code changes regarding the product or any changes in Parex's own policies regarding the use of it.

There is a presumption that jurors understand and follow the court's instructions.... More specifically, [w]hen curative instructions are given, it is generally presumed that the

mention and introduce evidence of prior malpractice suits against the physician defendant. Thereafter, in his opening statement and before a ruling could be made, plaintiff's counsel stated that the defendant had been sued five times for malpractice in another state. Defense counsel immediately moved for a mistrial but the trial court denied the motion. In holding that the trial court erred, the Court of Appeals explained that defense counsel expressly stated that he planned to introduce evidence of prior incidents of malpractice to "show[ ] that he has this ongoing phenomena of negligent care and treatment," *id.* at 311, 818 A.2d 237, but that the evidence was clearly irrelevant if offered for that purpose. *See id.* at 318–25, 818 A.2d 237. The Court further observed:

> Where a trial has progressed only so far as opening statements when a prejudicial error occurs, the waste of "the investment of parties, witnesses, counsel, jurors, and trial court by having the proceedings result in a mistrial" is minimal when compared with the possible taint on the overall proceedings. Therefore, if remarks made by an attorney in an opening statement include "facts" that plainly are inadmissible and highly prejudicial to another party, a mistrial ordinarily would be one of the principal remedies considered, upon motion by the adversely affected party.

*Id.* at 318, 818 A.2d 237 (footnote omitted).

In the instant case, the trial court attempted with its ruling to permit Pulte to present evidence that Parex's Barrier EIFS was defective while at the same time preventing Pulte from suggesting that the defect had led to subsequent remedial measures. The complexity of the issues and the difficulty in complying with the court's direction were apparent. In *Lai*, however, the trial court flatly stated that it would make a decision at a later time, presumably after hearing a proffer and argument, on whether the plaintiff could mention prior incidents of malpractice on the part of the defendant. By nevertheless mentioning the incidents in his opening statement, counsel blatantly disregarded the court's position on the matter.

In addition, the impropriety in *Lai* was committed during opening statement, before significant time and resources had been invested into the trial of the case. In the case *sub judice*, the argument about which Parex complains was made in closing, after a lengthy and complicated trial. The trial judge, who had been present throughout the entire proceeding, was in the best position to gage the effect of the argument on the jury.

jury can and will follow them. . . . Furthermore, the trial judge is in the best position to determine whether his instructions achieved the desired curative effect on the jury. . . .

*Owens–Illinois, Inc. v. Gianotti,* 148 Md.App. 457, 476, 813 A.2d 280 (2002), *aff'd,* 386 Md. 468, 872 A.2d 969 (2005). In light of the abundant evidence that the damages to the relevant homes were caused by some failure of the Barrier EIFS, we have no reason to question the trial court's assessment. We perceive no abuse of discretion.

## VII.

### Pre-judgment Interest

 Finally, Parex argues that the trial court erred by accepting the jury's finding that Pulte was entitled to pre-judgment interest, and by awarding pre-judgment interest based on the jury's finding that Parex was liable for $50,000 in damages as to each of twenty-three homes. Under the circumstances of this case, we must agree.

 As this Court has explained, "The purpose of the allowance of prejudgment interest is to compensate the aggrieved party for the loss of the use of the principal liquidated sum found due it and the loss of income from such funds." *I.W. Berman Props. v. Porter Bros., Inc.,* 276 Md. 1, 24, 344 A.2d 65 (1975). "Pre-judgment interest is allowable as a matter of right when 'the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date.' " *Buxton v. Buxton,* 363 Md. 634, 656, 770 A.2d 152 (2001) (citation omitted). "[E]ven when the amount is certain, a legitimate dispute as to the obligation to pay deprives the claimant of an absolute right to interest, and places the case into that category where interest is discretionary with the fact-finder." *Gordon v. Posner,* 142 Md.App. 399, 438, 790 A.2d 675 (2002).

██ ██ Ordinarily, "[w]hether a party is entitled to pre-judgment interest ... is left to the discretion of the fact finder. 'The exercise of discretion to award prejudgment interest must be based on the "equity and justice appearing between the parties and a consideration of all the circumstances." ' " *Ver Brycke v. Ver Brycke*, 150 Md.App. 623, 656–57, 822 A.2d 1226 (2003) (citation omitted), *aff'd in part, rev'd in part on other grounds*, 379 Md. 669, 843 A.2d 758 (2004).[24]

In this case, Pulte's entitlement to pre-judgment interest was not a matter of right but rather was within the discretion of the jury as fact finder. Because the only claims that went to the jury were the assigned breach of implied warranty claims of Coronado and CSS, it was essential that, in exercising its discretion to award pre-judgment interest, the jury determine whether Parex's "obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment," and if so when that payment should have been made. *Buxton*, 363 Md. at 656, 770 A.2d 152. Pulte's posits that Parex became obligated to pay Coronado and CSS on the date the consent judgments against them were entered, and that the trial court correctly calculated the pre-judgment interest from "Pulte's date of payment."[25] Even assuming that there was one single date of payment for repairs to all twenty-three homes for which the jury determined damages, Pulte's position is untenable.

Clearly, Parex has consistently denied liability for any portion of the damages. The fact that Coronado and CSS settled with Pulte and permitted the entries of consent judgments against them could not render Parex's obligation to pay the applicators "certain, definite, and liquidated" by any "specific

---

**24.** Although the Court of Appeals reversed in part this Court's decision in *Ver Brycke v. Ver Brycke*, 150 Md.App. 623, 822 A.2d 1226 (2003), it expressly affirmed our decision as to pre-judgment interest. *See Ver Brycke v. Ver Brycke*, 379 Md. 669, 702–03, 843 A.2d 758 (2004).

**25.** Neither party has provided a citation to the record extract that would confirm the starting date for the court's calculation of pre-judgment interest.

date." *Id.* The dispute as to liability was legitimate, and it denied Coronado and CSS—and therefore Pulte—an absolute right to interest and left the matter to the discretion of the fact-finder. *See Gordon,* 142 Md.App. at 438, 790 A.2d 675.

The jury determined that Pulte, as assignee of Coronado and CSS, *was* entitled to pre-judgment interest. As we explained in Part IV of our discussion of Parex's cross-appeal, however, Pulte presented no evidence to the jury regarding the settlement. Although ample evidence was presented from which the jury could determine that Coronado and CSS were liable to Pulte for the damages to the relevant homes, the jury was never told when, if ever, Coronado and CSS paid Pulte for repairs, or how much, if anything, they paid. There was simply no basis for the jury's decision that Coronado and CSS—and thus Pulte—were entitled to interest for the loss of income from funds paid out.

## CONCLUSION

We thus vacate the summary judgment entered by the trial court in favor of Parex on the implied indemnity claims brought by Pulte as assignee of American EIFS, as well as the award of $1,429,380.16 in damages. We remand the case to the trial court with instructions to enter judgment in favor of Pulte for $725,000. Because Pulte is limited in the amount it may recover by the amount of its agreement with the settling defendants, and because the settlement obligation is joint and several, we shall not remand the case to the trial court for further proceedings as to the assigned claims of American EIFS, and our vacation of the summary judgment as to those claims is of no significant consequence.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY IN FAVOR OF APPELLEE AS TO CLAIMS BROUGHT BY APPELLANT AS ASSIGNEE OF AMERICAN EIFS VACATED; AWARD OF DAMAGES TO APPELLANT VACATED; FINDINGS OTHERWISE AFFIRMED; CASE REMANDED WITH INSTRUCTIONS TO ENTER JUDGMENT IN FAVOR OF APPELLANT,**

AS TO CLAIMS BROUGHT BY APPELLANT AS AS-
SIGNEE OF CORONADO AND CSS, FOR $725,000.00.

COSTS TO BE PAID ½ BY APPELLANT AND ½ BY
APPELLEE.